UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*ORIGINAL*


Before The Honorable YVONNE GONZALEZ ROGERS, Judge


| | | |
|---|---|---|
| WINDY CITY INNOVATIONS, LLC,) | | **Pre-filing Conference** |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | NO. C 16-01730 YGR |
| ) | | |
| FACEBOOK, INC., ) | | Pages 1 - 65 |
| ) | | |
| Defendant. ) | | Oakland, California |
| _____) | | Monday, January 28, 2019 |


### REPORTER'S TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

For Plaintiff:          Caldwell Cassady & Curry
                        2101 Cedar Springs Road, Suite 1000
                        Dallas, Texas  75201
                 BY:    BRADLEY W. CALDWELL,
                        WARREN J. McCARTY, III,
                              ATTORNEYS AT LAW

                        Banys, P.C.
                        1030 Duane Avenue
                        Santa Clara, California  95054
                 BY:    CHRISTOPHER BANYS,
                        JENNIFER GILBERT, ATTORNEYS AT LAW

            (Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

## A P P E A R A N C E S (CONT'D)


For Defendant:          Cooley Godward
                        3175 Hanover Street
                        Palo Alto California 94304-1130
                   BY:  HEIDI L. KEEFE, ATTORNEYS AT LAW


                        Cooley LLP
                        1299 Pennsylvania Avenue NW
                        Suite 700
                        Washington, DC  20004
                   BY:  PHILLIP E. MORTON, ATTORNEY AT LAW


ALSO PRESENT:  Andrea Modugno

               Shayne O'Reilly

```
 1  Monday, January 28, 2019                        2:01 p.m.

 2                    P R O C E E D I N G S

 3          THE CLERK:  Calling civil action 16-1730, Windy City

 4  versus Facebook.

 5      Counsel, please come forward and state your appearances.

 6          MR. CALDWELL:  Good afternoon, Your Honor.  Brad

 7  Caldwell on behalf of plaintiff Windy City.  And with me today

 8  is my colleague Warren McCarty and also our local counsel

 9  Chris Banys and Jennifer Gilbert.

10          THE COURT:  All right.

11          MR. CALDWELL:  Plaintiffs are ready to proceed, Your

12  Honor.

13          THE COURT:  Good afternoon.

14          UNIDENTIFIED SPEAKER:  Afternoon, Your Honor.

15          MS. KEEFE:  Good afternoon, Your Honor.  Heidi Keefe

16  on behalf of Facebook.  With me at table is Phil Morton, also

17  from Cooley.  And on the other side of the table, I have two

18  representatives from the client.  One is Drea Modugno.  The

19  other is Shayne O'Reilly, both in-house counsel at Facebook.

20          THE COURT:  All right.  Good afternoon.

21          MS. KEEFE:  Thank you, Your Honor.

22          THE COURT:  I need mics, each of you at a mic.

23      So let's start with -- I guess with rules.  I have now

24  been here eight years?  Seven years?  Long time.  Never has

25  someone from Cooley or any other firm told me that they don't
```

1    understand what a letter is, Ms. Keefe.

2          **MS. KEEFE:**  Your Honor, I do understand what a letter

3    is, but I was attempting to make sure that we followed all of

4    the rules.  Your standing order in paragraph nine says to file

5    a letter, but the local rules require that any

6    document that --

7          **THE COURT:**  I am telling you that I have been sitting

8    here for years and never has someone respond in the way that

9    you did.  Never.

10          **MS. KEEFE:**  I apologize, Your Honor.  We were doing

11    what we thought we could do to make sure that we followed all

12    of the rules to the letter.

13          **THE COURT:**  And then to submit to me a reformatted

14    letter with a different font and a smaller type face.  Sure,

15    you can get anything on three pages if you change the font and

16    the type face.

17          **MS. KEEFE:**  Your Honor, that is the format that "the

18    Cooley" template has for letters.  We did not alter it.  We

19    used "the format" that if we had just opened up a letter on

20    the Cooley computer.  That is the format and the template with

21    that font size we would use.

22          I apologize if Your Honor wants us to -- if you want to

23    strike that and have us refile, there are easy ways that I can

24    shorten the letter.  I'd be happy to do so.

25          But in all honestly, Your Honor, we were trying to comply

1    with the letter of both Your Honor's standing order and the

2    local rules together to make sure that it was on a caption and

3    was still in the form of a letter.

4        I do apologize if Your Honor --

5            **THE COURT:**  It seemed to me to be an --

6            **MS. KEEFE:**  -- displeased.

7            **THE COURT:**  -- end-run around my rules.  That's what

8    it seemed to be.

9            **MS. KEEFE:**  And I apologize for that --

10           **THE COURT:**  And --

11                   (Simultaneous colloquy.)

12           **THE COURT:**  -- and your response seemed to be a

13    justification.  I am telling you what it appears to me to be.

14    You can call John Dwyer.  I can't tell you how many letter

15    briefs I have gotten from Cooley, never in the format that you

16    have provided.

17           **MS. KEEFE:**  I apologize, Your Honor.

18           **THE COURT:**  Never.

19           **MS. KEEFE:**  I apologize, Your Honor.  I will never do

20    that again, Your Honor.

21        It was --

22           **THE COURT:**  We are busy federal judges.  We have page

23    limits and rules so that you can focus on what's important and

24    not overburden the court.  The motion to dismiss it seems to

25    be yet another example of an attempt to do an end-run around

1    the one motion for summary judgment rule.

2          **MS. KEEFE:**  Again, Your Honor, it was absolutely not.

3       We view the motion to dismiss as a motion under 12(b)(1),

4    which is not a summary judgment motion under Rule 56.  It's a

5    motion that had to be brought because it is a threshold issue

6    regarding whether or not there is standing.

7       That's why we brought it under 12(b)(1).  We brought it as

8    soon as we possibly could so that Your Honor saw the issue as

9    soon as it was fully fleshed out.  And that's how and why we

10   brought that motion.

11      It was a -- absolutely not intended to end-run Your

12   Honor's one motion rule.  I know very well about that.  Your

13   Honor and I even had a conversation about it during --

14          **THE COURT:**  Exactly.

15          **MS. KEEFE:**  -- telephonic conference.  And you

16   specifically said to me. "you get one motion for summary

17   judgment."  I was very, very well aware of that, and that's

18   exactly -- the only issues that we have in the letter that we

19   submitted in the wrong format to Your Honor -- and we

20   apologize for that.

21      In terms of the 12(b)(1), we did not and do not view that

22   as summary judgment.  We view that as a Rule 12(h)(3) and

23   12(b)(1) motion regarding standing that had to be brought as

24   soon as possible because it's a threshold issue.

25          **THE COURT:**  If I cannot understand -- or if I do not

1    have to make factual findings with respect to what appendix A

2    covers and the merits of the patent infringement case, how is

3    it that that would fall within Rule 12 as opposed to Rule 56?

4          **MS. KEEFE:**  Again, Your Honor, when we did all of the

5    research -- in fact, in the case that's cited, the *Pandrol vs.*

6    *Airboxx* case, as well as -- that's cited in the brief, I

7    think -- the reply brief at page nine, 320 F3d. 1354, as well

8    as a couple of other cases -- and I'll get the names of those

9    for Your Honor as well -- that we cited that specifically

10   addressed that 12(b)(1) was the proper vehicle for these

11   standing issues.

12        In fact, in the *Pandrol vs. Airboxx* case, that issue

13   didn't come up until the appellate record.  And the court

14   there said, because it's such a threshold issue, it has to be

15   brought to the court's attention and, in fact, can be

16   converted even sua sponte by the court if the court sees the

17   issues.

18        So we followed what we truly believed to be the proper

19   vehicle which was using 12(b)(1) which discusses standing and

20   12(h)(3), which says that it's a threshold issue that has to

21   be brought.  And that's how and why we brought that issue just

22   that way.

23          **THE COURT:**  Response.

24                  (Off-the-record discussion.)

25          **MR. McCARTY:**  I apologize.  This is Warren McCarty on

1    behalf of the plaintiff.

2        The Ninth Circuit precedent that's cited in our papers and

3    cited in plaintiff -- or in Facebook's papers make clear that

4    there are two reasons why this is a summary judgment it shall

5    be treated as a summary judgment motion, because when you

6    intertwine jurisdictional issues with factual issues like in

7    the case of a patent standing challenge, that is to be treated

8    as a Rule 56 motion.

9        These are authorities that are cited in Facebook's own

10   brief.

11       Secondly, when you're asking Your Honor to decide issues,

12   for example, jurisdiction, and look beyond the public record,

13   Ninth Circuit law is similarly clear that that constitutes --

14   or is to be treated a Rule 56 motion as well, 'cause you're

15   not looking at just the face of the pleadings, not looking at

16   the public record.

17       If you looked at the public record, it would demonstrate

18   that Windy City has proper standing because the public record

19   has a clear chain of title as established by the United States

20   Patent Office.

21       So what -- when we received this motion, the first thing

22   we immediately notice is the cases that they're asking Your

23   Honor to consider demonstrate that this is actually a Rule 56

24   motion.

25       And so, of course, we had to address the substantive

1   issues, but we also pointed out this -- and we didn't meet and

2   confer or provide pre-filing letters.  We didn't ask for a --

3   a letter conference on this issue.  It was sort of this

4   half-baked motion filed at the very end of discovery or just

5   after the close of fact discovery.

6       And we see that as absolutely one to be treated as a

7   motion under Rule 56, as demonstrated by the very cases cited

8   in Facebook's original motion.

9           MS. KEEFE:  Your Honor, the cases that I didn't have

10  at the tip of my fingers are *White vs. Lee*, which is a Ninth

11  Circuit case dismissing a civil suit for lack of standing

12  under Rule 12(b)(1), and it was brought as a 12(b)(1) motion.

13      Also --

14          THE COURT:  Ninth Circuit case?  What is the cite?

15          MS. KEEFE:  The Ninth Circuit case, the citation is

16  227 F3d. 1214, pin cite 1242.

17      Similarly, *Max Sound vs. Google*, which is a Northern

18  District case.  It was Judge Davila, which dismissed a patent

19  suit for lack of standing under 12(b)(1).  That was another

20  case that had multiple factual allegations regarding contracts

21  that were not in the public record and that was brought after

22  the close of -- after much discovery.  And the citation there

23  for Judge Davila's opinion is 147 F.Supp. 3d 948.

24          THE COURT:  Does he have a "one summary judgment"

25  rule?  If not, it's --

1    **MS. KEEFE:**  The answer, Your Honor, is I don't know.

2    I would have to recheck.  I have -- I don't know.  I wouldn't

3    want to guess.  I can look it up, and I'd be happy to do so,

4    Your Honor.

5          **THE COURT:**  I can look it up.

6          **MS. KEEFE:**  And then there was also another case,

7    Your Honor, from Judge Freeman, which is *Dominion Assets* --

8          **THE COURT:**  Again, unless they have a "one summary

9    judgment" rule, it doesn't really matter to me.

10         **MS. KEEFE:**  So Judge Freeman does have a "one summary

11   judgment" rule.  You can ask for permission to file something

12   else, and -- you have to ask for permission.

13      And it looks like Judge Davila also has a limitation of

14   one motion per party unless otherwise permitted, so both Judge

15   Freeman and Judge Davila have the rule.

16         **THE COURT:**  And of course you don't know whether

17   permission was granted.

18         **MS. KEEFE:**  In the case involving Judge Freeman, I do

19   not know.  In the case involving Max Sound, I was involved in

20   that case, and I do not recall us asking for any special

21   permission to file that brief.

22         **THE COURT:**  If I convert that motion to summary

23   judgment, that's all you get.

24         **MS. KEEFE:**  I understand, Your Honor.

25         **THE COURT:**  What do you want to do?  How good is the

1    motion?  Do you want to rest on that?  Or do you want to

2    withdraw and it do a proper motion?

3          **MS. KEEFE:**  Your Honor, it's a very strong motion,

4    but I would have to confer with my client to make sure what

5    they would want to do.  I do believe --

6          **THE COURT:**  One of the reasons we do this is so that

7    you pick and choose strong arguments.  It is not clear to me

8    that the arguments reflected in these letter briefs are as

9    strong as you think they are.

10         That's why we have page limits.  It makes you choose.

11         **MS. KEEFE:**  I appreciate that, Your Honor.

12         I do think that each of the arguments that we put forward

13   was very narrow and precise and could be dealt with in a

14   motion within only a few pages.  And, in fact, in terms of the

15   101 motion, raising it on summary judgment I think is the

16   appropriate vehicle for that since it's a question of law.

17         I would be -- I would just need to confer with my client

18   to make certain, Your Honor.  But in order to make sure that

19   all of the issues were preserved the right way, if Your Honor

20   wishes, we'd be happy to withdraw the motion and resubmit a

21   three-page letter on letterhead in 12-point font --

22         **THE COURT:**  We aren't going to redo that.  I don't

23   ever want to see it again.

24         **MS. KEEFE:**  Thank you, Your Honor.

25         **THE COURT:**  I'm not here to waste people's time.  I

 1   am not here to bring you in for the sake of bringing you in.

 2       But I do want my rules followed.

 3           **MS. KEEFE:**  Understood, Your Honor.

 4                (Pause in the proceedings.)

 5           **THE COURT:**  What was the factual allegations in

 6   *White*?

 7           **MS. KEEFE:**  I have that case here, Your Honor.

 8                (Pause in the proceedings.)

 9           **THE COURT:**  You seem to just cite it for a basic

10   proposition that you can bring 12(b)(1) motions.

11           **MS. KEEFE:**  So in that case, Your Honor, they were

12   actually discussing whether or not it should be summary

13   judgment or 12(b)(1).  And, in fact, the issues revolved

14   around First Amendment rights and --

15           **THE COURT:**  Why doesn't *White* control?

16           **MR. McCARTY:**  Your Honor, I'm looking at some

17   excerpts here about *White*.  I'm -- As I recall, and I don't

18   have the case in front of me, so for that, I apologize.

19       The *White* case was merely observing that a court may look

20   beyond the public record without having to convert a motion

21   into one for summary judgment.

22       However, the -- that proposition is bounded or cabined on

23   what is "public record."  And looking at some of the other

24   cases from the Ninth Circuit, including the *Mack vs. South Bay*

25   beer distributors case, the question is what can a court take

1    judicial notice of.

2        And the case law in the Ninth Circuit, including in this

3    district, is clear that things like confidential deposition

4    transcripts, confidential documents, things that aren't of the

5    public record that a court could take judicial notice of, are

6    not within the scope of -- of evidence that a court may

7    consider in a 12(b) -- 12(b) motion.

8        **THE COURT:**  Is that the proper test, what is in the

9    public record?

10       **MS. KEEFE:**  I don't believe so, Your Honor.  In fact,

11   the -- the quotation directly at issue in *White vs. Lee* on,

12   page 1242 -- specifically the quotation is "Lastly, we

13   consider the plaintiff's cross-appeal of the district court's

14   dismissal of their claim for declaratory and injunctive

15   relief.  The H-U-D, HUD, officials moved for dismissal on the

16   alternative grounds of standing and" muteness -- "mootness.

17   Because standing and mootness both pertain to a federal

18   court's subject matter jurisdiction under Article III, they

19   are properly raised in a motion to dismiss under Federal Rule

20   of Civil Procedure 12(b)(1)."

21       Goes on to say that 12(b)(1) attacks can be factual or

22   facial.  And in the case of *White*, there was a facial attack

23   with some facts.  And so they said that was appropriate for --

24       **THE COURT:**  And were those facts in the public record

25   or not?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1              (Pause in the proceedings.)

 2         MS. KEEFE:  I'm just trying to make certain, Your

 3    Honor.  And it appears that a press release was, but a

 4    memorandum issued by HUD may not have been.

 5              (Pause in the proceedings.)

 6         MS. KEEFE:  And the rest is unclear.  I'd want to

 7    read it with -- I'd want to read it more carefully to make

 8    certain, Your Honor, but I don't -- I don't think that that

 9    was the issue that was being considered by the court in White.

10      The court was very clear that because this was a subject

11    matter jurisdiction issue under Article III, it was properly

12    raised under 12(b)(1).

13         THE COURT:  Wasn't -- Isn't the issue with respect to

14    conversion one of intertwineness?

15         MS. KEEFE:  I think it can be, Your Honor.  But

16    specifically in the White case, they said that there may be

17    factual --

18         THE COURT:  Are you claiming here that the issues are

19    not intertwined?

20         MS. KEEFE:  Am I claiming that the issues of whether

21    or not there's something on the public record versus not on

22    the public record are not intertwined?

23         THE COURT:  No.  Whether the facts that need to be

24    determined to grant your motion are intertwined with the

25    underlying dispute.
```

```
 1              MS. KEEFE:  I think that is true, Your Honor.  But

 2    that exact issue was also addressed by the DDB Technologies

 3    case, which is also cited in our briefs.  And the full

 4    citation for that is DDB Techs vs. MLB Advanced Media, 517

 5    F3d. 1284, which is a Federal Circuit case from 2008.

 6         And the direct quote there rejecting the argument that it

 7    was inappropriate to do a 12(b)(1) specifically noted, "We

 8    think that the interpretation of the employment agreement,

 9    which depends in part on state contract law and in part on the

10    circuit's" -- Federal Circuit's -- "law regarding patent

11    assignment clauses is not so intertwined with the substantive

12    federal patent law --"

13              THE COURT:  Right, so there, they determine that it

14    was not intertwined.

15         You just conceded that the issues are intertwined so that

16    doesn't help you.

17              MS. KEEFE:  So -- No, I'm apologize -- I apologize,

18    Your Honor.  I want to make sure I didn't misspeak.

19         When you're asking me are the issues intertwined, you're

20    asking me are the issues of patent law intertwined with the

21    issues of standing?

22         I just want to make sure I'm answering the right question,

23    Your Honor.

24              THE COURT:  In order for me to figure out the scope

25    and/or assignment of the patent rights, I need to understand
```

1  the features of Appendix A in each of them, and what the

2  claims are.  Don't I?

3          **MS. KEEFE:**  But that's no different -- Yes, Your

4  Honor.  But that's no different from exactly what was

5  happening in *DDB Tech* where the court held that just because

6  there are factual issues, they're not so intertwined with

7  substantive patent law that dismissal would be inappropriate,

8  so they actually did find that the dismissal was appropriate

9  under 12(b)(1).

10      I do think, Your Honor, you do have to understand what the

11  context of the underlying documents are, but that's no

12  different from the *Max Sound vs. Google* case which was

13  dismissed under 12(b)(1) by Judge Davila.  That's --

14          **THE COURT:**  Again, persuasive, but it's not binding

15  on me.

16          **MS. KEEFE:**  Understood, Your Honor.  Absolutely.

17      But just like the other -- the *White* case that we cited

18  for the proposition that 12(b)(1) is the appropriate mechanism

19  here.

20          **THE COURT:**  Response.

21          **MR. McCARTY:**  Your Honor, Facebook -- my friend from

22  Facebook cite the *DDB Techs* case.  That's a Federal Circuit

23  case.  The -- the regional law of this circuit, the Ninth

24  Circuit, applies here.  And the cite for -- for that

25  proposition is 449 Fed Appendix 941 (sic).

1      Moreover the -- the intertwinement, whether it was a

2   slip-up or not, the facts and the jurisdictional question are

3   so intertwined in this case.  There is no way to decide the

4   motion pending before Your Honor without intertwining these

5   issues.

6      Your Honor hit it -- hit the nail right on the head.  You

7   have to understand the scope of the confidential contract from

8   1995.  You have to understand the deposition testimony and so

9   forth.  This is the quintessential situation of intertwinement

10   that in the Ninth Circuit when those issues are so

11   intertwined, we are -- we're in a world where this is one for

12   summary judgment.

13      **MS. KEEFE:**  I would just refer Your Honor again back

14   to the *White vs. Lee* case in the Ninth Circuit which have

15   specifically held that 12(b)(1) was the proper vehicle.

16      **MR. McCARTY:**  Your Honor, I don't -- I don't dispute

17   that you can bring a jurisdictional challenge on 12(b)(1).

18   The question is at what point does that motion become

19   converted to a Rule 56 motion.  And the case law is clear,

20   there are two instances.  One is when the issues are

21   intertwined and/or when the court is required to go outside of

22   the public record and start considering confidential

23   materials, things that are not in the public record, both of

24   which are instances that occurred in this case.

25              (Pause in the proceedings.)

1      **THE COURT:**  What is the status of the appeal before

2   the PTAB?

3      **MS. KEEFE:**  Briefing has been concluded, Your Honor.

4   The parties have both submitted their dates that they have

5   conflicts, and we're awaiting a time to be set for oral

6   argument.

7      **THE COURT:**  When do you anticipate that happening?

8      **MS. KEEFE:**  I anticipate it happening -- my guess is

9   based on what the -- both parties had in terms of their

10   conflict dates, I'm guessing it could be April or June?

11     Does that sound right?

12     **MR. McCARTY:**  And, Your Honor, I don't think that's

13   right, but I actually can't give you a firm answer.

14     What I do understand from Windy City's IPR counsel is

15   that -- last time I spoke to them, they anticipated late

16   summer for -- for oral argument.  But, again, this is in the

17   context of the -- the conflict requests that the Federal

18   Circuit has asked for and whether they can get on the Federal

19   Circuit's calendar at any time over the summer or if it's

20   going to be pushed into the fall.

21     **MS. KEEFE:**  And I honestly thought there were dates

22   that overlapped, but --

23     **MR. McCARTY:**  Yeah.  I'm just not sure, Your Honor.

24     **MS. KEEFE:**  But just because our dates overlapped,

25   Your Honor, doesn't mean the Federal Circuit has to give us

1    one of those dates.

2                      (Pause in the proceedings.)

3          **THE COURT:**  Well, I'm seeing two more Ninth Circuit

4    cases which seem to suggest that in a 12(b)(1) context, the

5    court can look outside of the -- beyond the complaint to

6    matters of public record, and as long as it's within the

7    public record, it doesn't convert it to summary judgment.

8          So while my colleagues can choose to do what they want to

9    do, I'm not finding procedural support for the notion that

10   this shouldn't be a summary judgment motion, given that we

11   aren't dealing with the public record and given that everyone

12   seems to concede that these issues are intertwined.

13         **MS. KEEFE:**  Your Honor, again, applying Federal

14   Circuit case law because this is -- I know that it's also a

15   Ninth Circuit issue --

16         **THE COURT:**  It's not.

17                      (Simultaneous colloquy.)

18         **THE COURT:**  Right, but it's -- we're sitting in the

19   Ninth Circuit.

20         **MS. KEEFE:**  Understood, Your Honor.  And --

21         **THE COURT:**  So whose law do I have to follow on this,

22   Ms. Keefe?

23         **MS. KEEFE:**  Ninth Circuit.

24         **THE COURT:**  The Ninth Circuit or the Federal Circuit?

25   The Ninth Circuit, right?

1            MS. KEEFE:  The Ninth Circuit; that's right, Your

2   Honor.

3            THE COURT:  Okay.  So stop citing Federal Circuit

4   cases.

5            MS. KEEFE:  And I appreciate that, Your Honor.

6       We also had in that same DBD (sic) Technologies case one

7   quote that I neglected point out.  In *DDB Technologies* --

8            THE COURT:  Which is a Federal Circuit case.

9            MS. KEEFE:  I understand --

10            THE COURT:  Didn't I just sit here and didn't you

11   just agree with me?

12            MS. KEEFE:  Your Honor, you are absolutely right, and

13   as soon as I looked up and saw that, I stopped talking.

14       I would point Your Honor again just to the *White* case and

15   to -- I know it's only persuasive not binding -- but Judge

16   Davila's application of the law in a situation --

17            THE COURT:  Okay.

18            MS. KEEFE:  -- almost identical.

19            THE COURT:  It doesn't matter.

20       All right.  Tell me about your motion that you want to

21   bring.

22            MS. KEEFE:  The summary judgment motion that I would

23   like to bring, Your Honor?

24       So the summary judgment motion that we would like to

25   bring, Your Honor, would start off with an attack on 101.  We

1    believe that the claims that are left in this case are

2    abstract and do not have anything inventive that takes them

3    out of the realm of the abstract.  The idea --

4          **THE COURT:**  So if that's the case -- I do 101 motions

5    all the time.

6          **MS. KEEFE:**  Yes, Your Honor.

7          **THE COURT:**  Why would you not have brought this years

8    ago if that was a good motion?

9          **MS. KEEFE:**  For multiple reasons, Your Honor, not the

10   least of which is the fact that when the case was first

11   brought back in the earliest of days, there were something

12   close to 800 claims that were at issue.  And we didn't know

13   exactly which claims were going to survive throughout the

14   remainder of the case.

15      There were some claims that I don't think were as

16   susceptible to 101 attacks.  And rather than bother the court

17   with piecemeal motion work on a claim here and a claim there,

18   we waited to see which claims were at issue and whether or not

19   101 could take out all of those claims.

20      We didn't know that, Your Honor, until they filed their

21   expert report so that we knew what were the final narrowed

22   claims left in the case.

23      At that time, we were able to ascertain that the only

24   claims left in the case in the '245 patent are limited to the

25   abstract notion of sending information from one person to

1    another -- to a recipient, and if the recipient can't read

2    that information, then they go out and acquire something to

3    allow them to read it, not dissimilar to someone sending me,

4    for example, a VHS tape but I only have a DVD player, and so I

5    have to figure out a way to buy myself a VCR so that I can

6    receive the communication had (sic) to be presented to me.

7         Nothing different from that, Your Honor.  That's all

8    that's left in this case.

9         Then when you look to the second step about whether or not

10   there's anything inventive, there's not.  Column 1 makes clear

11   that this is just chat, as the type of chat that AOL had that

12   there was the sending of multimedia documents and other

13   information across the Internet.  That's all acknowledged as

14   old in column 1.

15        And then in column -- the bottom of column 4 up through

16   the first two paragraphs of column 5, the patent specifically

17   says that it's to be carried out on general purpose computers.

18        In fact, they actually talk specifically about an

19   IBM-compatible computer with a DOS operating system.  And so

20   these are just ordinary computers working together in ordinary

21   and acceptable predictable ways to accomplish something that

22   is done off of computers as well, which is when you receive a

23   communication that you can't review the format or you can't

24   see it, you go out and obtain the thing that you need in order

25   to do so.

1          **THE COURT:**  And this was not challenged earlier?

2          **MS. KEEFE:**  We did not do a prior 101 challenge.

3          **THE COURT:**  You didn't challenge any of this -- this

4    particular claim at the PTAB?

5          **MS. KEEFE:**  So it's not a CBM claim and so we

6    couldn't attack on 101 grounds.  We were only able to attack

7    on prior art grounds, so no, Your Honor, we did not challenge

8    on 101 grounds before.

9          **THE COURT:**  Response.

10          **MR. McCARTY:**  Your Honor, with your indulgence, may I

11   have my colleague present?  Thank you.

12          **MR. CALDWELL:**  Brad Caldwell on behalf of Windy City.

13    I could take it in whatever order suits the court but,

14   just to the extent there's some intended disparagement on the

15   number of claims or something like that, we are below the

16   number we're supposed to be at and --

17          **THE COURT:**  I don't know what you're talking about.

18   We're talking about the substance of the claim that she wants

19   to bring or challenge in summary judgment, her 101.  That's

20   what I'm talking about.

21          **MR. CALDWELL:**  Yes, Your Honor.  I was just trying to

22   address the question about -- you asked why it wasn't brought

23   earlier, and there was some allegation about the number of

24   claims, but we've been under reduced numbers ever since we

25   came back from the IPRs, so I -- I'm happy to move on beyond

1    that.  I just wanted to address that point that Your Honor

2    raised.

3        As to step one, first of all, the example that Facebook

4    gives about the VCR example essentially reads out the majority

5    of the claim.  This is a claim that -- this isn't just a pure

6    software claim.  It's a claim that involves network apparatus

7    there are authenticating users, transmitting private messages

8    with pointers to particular data.  And then it also involves

9    software agents that can address problems that may arise in

10   the technical context of an inability to handle a certain kind

11   of a media.

12       This is -- the fact that at some level, every patent claim

13   that has ever been issued can be described in some abstract

14   context is what I think has plagued judges like Your Honor

15   who've had to deal with so many 101 motions, and the Federal

16   Circuit complains about it constantly.

17       But trying to abstract this claim out in the sense of it's

18   essentially the same thing as buying a VCR is just unrealistic

19   and reads out what's actually claimed in the claim.

20       So as to step number one, that's why we pointed the *DDR*

21   *Holdings* case.  We think that's a very good example of you're

22   addressing a problem that's rooted in computer technology

23   where parties may be communicating and they may wish to send

24   content which happens -- just as in *DDR*, that sort of

25   transmission is essentially trivial in certain contexts, to

1   send them across the Internet.  But having the other person

2   able to actual handle that media is non-trivial.  It arises in

3   computer technology.  And this is a technical solution to it.

4   I think *DDR* is very on point.  That's why we cite that as a

5   reason why ultimately on step one, the challenge would with

6   fail.

7       I think an additional point is as to step two, Facebook's

8   fundamental argument that's in their letter and repeated today

9   is that they say this is all just technology being used in a

10  well-understood, routine, and conventional manner.

11      But I think something that wasn't addressed in their

12  letter and we hit on it very briefly is, you know, this is

13  a -- quite a topic of -- of a lot of legal opinions recently,

14  including the *Berkheimer vs. Hewlett Packard* opinion where the

15  Federal Circuit reversed a grant of summary judgment on this

16  basis that the party challenging the eligibility of the patent

17  says, well, this is just claiming routine, well-understood,

18  and conventional technology.

19      And the Federal Circuit -- I think it was Judge Moore who

20  wrote that opinion -- says, Well, hold on.  If you're telling

21  me that this thing is essentially just doing the prior art,

22  that's a traditional -- that's -- that's a factual

23  determination as it's always been, and, sure, the ultimate

24  conclusion on 101 may be one that is a legal question, but it

25  is based upon factual questions that have to be addressed

1  through clear-and-convincing evidence.  Thus, they reversed

2  the grant of summary judgment.

3      And I think here, I absolutely agree.  In the IPR context,

4  you can't challenge 101 at the PTAB.  I agree with that.

5      What you can do is you go and tell them this is routine,

6  conventional, things that are in the prior art just practicing

7  the prior art the way it was before.  And we're here on an

8  independent claim and four dependents where they lost and

9  failed to make that showing at the PTAB, showing at a very

10  minimum, there is certainly a fact issue as to whether in fact

11  this is actually well-understood, routine, and conventional

12  use.

13          **THE COURT:**  So was this claim, then, reviewed in a

14  different context by the PTAB?

15          **MR. CALDWELL:**  Well, they don't -- they don't review

16  101, which is the ultimately eligibility question --

17          **THE COURT:**  No, I'm talking about -- I understand

18  what you said by that.

19      But what -- your comment suggested to me that somehow they

20  had reviewed it or reviewed the prior art related to it.

21          **MR. CALDWELL:**  Validity.  It was a 102 and/or 103, so

22  anticipation or obviousness challenge to it.  And this is

23  the claim --

24          **THE COURT:**  So those -- so a 102 and 103 challenge

25  was brought and rejected.

1              MR. CALDWELL:  And -- I definitely don't want to -- I

2     don't want to say "and" and be wrong.  It was 102 and 103, and

3     as to this specific claim I can't remember.

4              MS. KEEFE:  103.

5              MR. CALDWELL:  Okay.  103.  So it was obviousness and

6     that was brought and challenged and rejected by the Patent

7     Office, and these claims were confirmed.  And so the -- the

8     appeal that Your Honor asked about would be an appeal to see

9     if Facebook could get that somehow overturned and now, you

10    know, it -- the claim would be invalidated, so it survived

11    that challenge at the -- at the PTAB, which was -- certainly a

12    statistical rarity historically, although I think the pendulum

13    is slowly swinging.

14             MS. KEEFE:  May I briefly respond, Your Honor?

15             THE COURT:  You may.

16             MS. KEEFE:  So, Your Honor, the first thing that I

17    would want to respond with is just because a claim has been

18    confirmed or not found to be invalid under 103 does not mean

19    that the computer elements that are used are conventional and

20    done in a conventional manner.

21        In fact, in the expert reports, Dr. Storer, professor at

22    Brandeis, who is the expert for Facebook had a lengthy section

23    of his expert report regarding invalidity, which we present

24    first, where he specifically talked about 101 and why he

25    believed everything disclosed in the patent was routine and

1    conventional.  That opinion stands in the record unrebutted.

2        In fact, at Dr. Jones' deposition -- Dr. Jones is the

3    expert for plaintiffs -- he was asked on page 113, at line 21,

4    "Okay.  Now, there is actually a section in here" -- and what

5    they're talking about is Mr. Jones' report -- "where you're

6    talking about Section 101" -- that's on paragraph 15 -- "where

7    you're summarizing what -- patent eligibility under 101."

8        "A.  Yes."

9        "Q.  When I read your report, I couldn't find an actual

10   opinion with respect to invalidity or validity under 101.  Am

11   I correct about that?

12       "A.  I don't recall putting one in."

13       So Dr. Jones did not contradict anything stated by

14   Dr. Storer about 101.  And so we have unrebutted evidence from

15   an expert explaining that everything in the patent is

16   conventional and used in a conventional manner.  The

17   specification alone shows that when it talks about the use of

18   normal regular computers doing what they do best.

19       As far as whether or not *DDR* applies, Your Honor, *DDR* was

20   a case where something that happened only on computers was

21   being addressed.  It was the notion that if you clicked on a

22   link, you would be taken to a completely different website

23   which looked different.

24       It was analogized to being in a Home Depot where you if

25   you suddenly went to the Black & Decker display to look at it,

1  you would be transported to another store and you wouldn't go

2  back to the original store.  So that was something that arose

3  only in the context of computers.

4     Here, "the problem" -- which we even heard plaintiff's

5  counsel talk about -- the problem of being able to recognize

6  multiple formats that are sent to you is not a problem that's

7  rooted in computers.

8     The example of a VCR or DVD works.  It similarly works if

9  I were to receive a letter that was written in Chinese and I

10  don't happen to understand Chinese, so I have to go find an

11  agent or translator to help me understand what that is.

12           **THE COURT:**  Respond on the expert issue?

13           **MR. CALDWELL:**  On the -- on the expert declaration?

14     So what Dr. Jones did not do is he did not provide an

15  opinion on the ultimate -- the ultimate legal issue of 101.

16  His entire rebuttal report is opining on the validity, failure

17  to show invalidity, failure to show that this is conventional

18  technologically.  The entirety of his report is addressing

19  this point.

20     It -- It's a little bit of an opportunistic "gotcha" on a

21  question as to -- 'cause if you're listening to what they --

22  they just read was the question and answer, it was "I didn't

23  see where you opined on the answer as to 101."  And that's

24  true.  He didn't -- he didn't say "I opine as to 101" 'cause

25  that falls to Your Honor on the ultimate question.

1       And I think it's sort of making our point of there are

2  factual disputes as to what is conventional, what's rooted in

3  computer technologies, and problems that were fundamental in

4  computer technologies.  All of this is what he addressed

5  through the conclusion -- throughout the ultimate -- or I'm

6  sorry -- throughout the entirety of his report so that is

7  absolutely addressed, and it's -- he didn't step on Your

8  Honor's toes as to the ultimate conclusion as to whether it's

9  eligible under 101 after those facts have been determined.

10          **THE COURT:**  All right.  Non-infringement.

11          **MS. KEEFE:**  Your Honor, regarding the first

12  non-infringement issue, this is -- and I think I did discuss

13  this with Your Honor during the call back in July where we

14  said there were some claim constructions that if you adopted

15  our construction, there would be no infringement.  This is one

16  of those.

17       There is a definition for "real time" which comes from a

18  file history disclaimer where in order to overcome a reference

19  named Brown, the patent owner said that they were different

20  because they were real time.  In other words, things weren't

21  being stored on a computer.  That's the definition we proposed

22  to Your Honor during claim construction.

23       Plaintiff has said they think it's just plain meaning.

24  They asked our expert whether or not he understood the plain

25  meaning in terms of the specification.  He said perhaps that

1   was closer to their definition but that he understood our

2   definition was rooted in the file history, and using that

3   definition, there is no infringement because Facebook stores

4   all of its messages.  There are none that are passed through

5   without storage.

6       That's the definition that we proposed.  That's why

7   there'd be summary judgment.

8       We also asked their expert Dr. Jones if he applied

9   Facebook's construction -- so in other words, if Your Honor

10  were to adopt our construction, did Dr. Jones have an opinion

11  regarding infringement.  Dr. Jones said, no, he did not have

12  an opinion regarding infringement using our construction.

13      And we asked the next question, was that because every

14  instance of Facebook's system stores the data.  And he

15  responded yes.

16      And so that's at page 25, columns -- sorry -- lines 3

17  through 13 in the Jones deposition.  And so that's why we

18  think this is a simple issue.

19      If Your Honor adopts our construction of "real time,"

20  Mr. Jones has said he has no opinion as to whether or not

21  Facebook would infringe because, and I quote, in the analysis

22  that you performed with respect to Facebook's alleged

23  infringement, the communication is stored on the server,

24  correct?

25      "Answer:  Yes."

1    THE COURT:  Response.

2         MR. CALDWELL:  Your Honor, I -- first of all, on the

3    claim construction point, I think if we were taking up claim

4    construction and which -- I know Your Honor's super familiar

5    with the law on that -- but in order to find a disclaimer, you

6    have to find a clear and unmistakable disclaimer and the scope

7    of the disclaimer would have to be narrowly tailored to what

8    it is they're saying.

9         And I -- I realize we're not here to argue *Markman*, but

10   what Your Honor would see is there is neither a disclaimer,

11   nor is it limited to "you can't store something."  I mean --

12   and just think most fundamentally, if someone were just having

13   a phone call, I don't think anyone disputes that that's real

14   time.  And the fact that it might be archived on a server is

15   not the issue.

16        The issue has always focused on immediacy.  I mean, the

17   word we're talking about is "real time," and it's a

18   transparent attempt to bake in a non-infringement position

19   when, in addition to the immediacy notion, you bake in a it

20   can't be stored on a server, which is facially rejected by the

21   patent itself.

22        And this patent is a little bit interesting in that there

23   are some contents in it that sometimes you don't see.

24   Sometimes you see a short specification.  But there's actually

25   a multiple page chat transcript that makes up the last several

1   columns of this patent specification.  How was that included

2   in the specification if this preferred embodiment chat wasn't

3   stored?  It obviously was stored, and so the notion -- the

4   notion that you couldn't also store while meeting real time

5   transmission is -- I just don't know how to put it other than

6   a super-transparent attempt to bake in a non-infringement

7   argument.

8         And even one of the asserted claims, I think, is a great

9   example of this.  And I -- my recollection is it's claim 22

10  that requires that in the communication, you're sending a

11  pointer.  So if, for example, I was sending Your Honor a

12  message with a picture of the Alamo or what-have-you.  It's --

13  you might get something that is a pointer to pull down that

14  picture because it is stored so that as you get this

15  communication, your system can pull it down.

16        And -- and trying to bake in something that is just

17  facially rejected by both the specification but also

18  completely and internally inconsistent with the language of

19  the claims is the most uphill of battles as you might imagine

20  in trying to read in this limitation, so that would -- that

21  would never happen.

22        And I think even -- even setting this aside -- I don't

23  think you ever get to this point -- summary judgment wouldn't

24  be proper even under their construction 'cause there are

25  still -- there are still disputes as to whether the

1  communication is "the" communication that's recited in the

2  claim that's actually transmitted without storage if you focus

3  strictly on the communication that's cited in the claim.

4      It's just the quintessential fact question for the jury at

5  this point.

6          **MS. KEEFE:**  And, again, Your Honor, he says he has no

7  opinion if our construction is adopted, and the file history

8  quote -- this is not an attempt to read something in.  We're

9  using the language from the file history -- "In order to

10 distinguish around Brown, the patent owner said Brown does not

11 disclose real-time operations.  All claims require

12 real-time" --

13         **THE COURT:**  You know that cherry-picking out of file

14 history is not always consistent with the law.  You know that.

15         **MS. KEEFE:**  I do, Your Honor.  But here, it

16 absolutely is consistent with what they're talking about.

17     The part of the message that Mr. Caldwell is talking about

18 that is stored is "the" prestored data.  That's the data to

19 which there is a pointer.  That is not "the message" that

20 comes from the first user being sent up to the computer and

21 then being sent on.  That's the message that would say, for

22 example, something along the lines of, here, look at this

23 picture of the Alamo.  Then it includes a link to the

24 prestored data.  That prestored data is just the picture of

25 the Alamo.  It's not the message.

1    And that's what they were distinguishing around in Brown.

2    This is not when you send a message, it stores it on a server,

3    and then it goes on.  It forwards it on to the recipient.

4    They're saying that's very different.  Real time is immediate

5    between the two of you and not stored.

6    So I'm not cherry-picking, Your Honor.  This is how they

7    distinguish themselves from a piece of prior art that

8    specifically dealt with the issues of trying to figure out how

9    to make sure that the end message could be read on the other

10   end.

11          **THE COURT:**  Next.

12          **MS. KEEFE:**  The second issue regarding

13   non-infringement, Your Honor -- Mr. Caldwell pre-staged it a

14   little bit -- has to do with what is "the message."  Every

15   claim -- sorry.  "The" independent claim, which is there's

16   only one independent claim left, requires that a message, a

17   private message be sent between two individuals.

18   The claim then goes on to require that same message be

19   sent up to the server.  That same message goes from the server

20   to the intended recipient.

21   If you follow the language down the claim, Your Honor,

22   what you see is the first recitation to "a" private message

23   being sent to a computer system.  "'The' private message

24   including," and it talks about a pointer and some content.

25   It goes on to say, "The computer system communicates 'the'

1    private message to the second participator computer."  And

2    then it talks about the fact that the second participator

3    computer is programmed to receive the communications "in 'the'

4    private message."

5        So it's all the same message that starts from one and gets

6    to another.

7        There -- During deposition, Dr. Jones admitted that

8    there's no dispute that the message that is sent from the

9    first participator is not the same as the message that's

10   received by the second participator computer.

11       He actually calls them "different messages."  He calls it

12   "message request 39," which is the message sent -- "the"

13   private message being sent.

14       And then he explains through his report that the server

15   then creates a new thing called "a delta message" and the

16   delta message is what is sent on to the recipient.

17       And he admits at pages 69, lines 14 through 18, and page

18   70, starting at line 10, continuing on to page 72, line 3,

19   that those messages are not the same.

20       I think they're trying to argue that there's some kind of

21   doctrine of equivalents or some kind of -- but it's the same

22   basic information.  But that's not what the claim requires.

23   The claim requires "'the' same private message."  Not the same

24   content, not the -- just the same material.

25       And, in fact, Dr. Jones admitted --

```
 1              THE COURT:  Who is the -- who's skilled in the art
 2    for this particular patent?
 3              MR. CALDWELL:  What's the definition of a person
 4    skilled in the art?  Let me -- I don't want to misstate it.
 5    Let me make sure that -- see if we can get it.
 6                    (Off-the-record discussion.)
 7              MR. CALDWELL:  I'm sorry, Your Honor.  It's probably
 8    in our Markman briefing, but I just -- I don't have it.
 9              THE COURT:  Do you agree --
10              MS. KEEFE:  I think we're very close, Your Honor.
11              MR. McCARTY:  This is Warren McCarty.
12         Both of the experts have very similar definitions, but
13    there is (sic) some slight subtle differences.  But both agree
14    their opinions wouldn't change on issues of infringement or
15    validity if one were adopted over the other.
16         And it -- and it pertains to, you know, someone with a
17    computer science background who I believe has around two to
18    five years of experience in that field.  And, of course, has
19    a -- a degree in computer science or software engineering.
20    And there are some subtle differences, as I -- as I mentioned.
21    But I think both experts agree to the extent the court adopts
22    one or the other their opinions would be consistent.
23              MS. KEEFE:  That's correct, Your Honor.  And it's
24    essentially a -- essentially with the minor differences a
25    person with a BS in either computer science, computer
```

1  engineering, electrical engineering, electrical and computer

2  engineering or similar program and two to four years of

3  additional experience in industry or with a graduate degree.

4     I think the one thing that's different between us is that

5  we said you could also do almost all of the same thing with

6  less academics and greater industry, but that wasn't disputed

7  when that question was raised for both experts.

8         **MR. CALDWELL:**  And, Your Honor, I've not responded to

9  the substance of her argument.  I'm happy to if -- if you'd

10  like.

11         **THE COURT:**  Go ahead.

12         **MR. CALDWELL:**  As to private message as distinguished

13  from the first example that we talked about, Facebook never

14  sought a construction of -- of private message, so this is

15  something where we're kind of squarely in the battle of the

16  experts or however you want to look at it, technical

17  discussion.  But as to is this issue of some sort of

18  concession, there's a different message.

19     What happens is that the format of what is transmitted is

20  changed as the message goes through servers at Facebook.  The

21  message is not changed.  And "the" private message is sent

22  from one end to the other.

23     We -- I mean, I understand that Your Honor's not probably

24  wanting to go through technical documents or anything, but I

25  mean, we have even a chart with me.  But my point is simply

1    that the substance, "the message" is actually conveyed.  The

2    format changes.

3        And I think maybe it was Ms. Keefe that mentioned this

4    notion of a translator.  But not to oversimplify, but if you

5    were to tell someone you'll pick them up at Charles de Gaulle

6    at 6:00 p.m. and then that's, you know -- someone translates

7    it to French, the message isn't different because the format

8    was exchanged.

9        But in any event, like I say, this isn't a claim

10   construction issue and the experts come out to a different

11   conclusion on this fact dispute.

12       **MS. KEEFE:**  Your Honor, it's -- the parties agreed to

13   a construction of "private message," which is "a message with

14   only one intended recipient."

15       And when Dr. Jones was asked what is "the private message"

16   being sent from the first user to the network, he identified a

17   specific message.

18       We then asked him is that is the same message that's

19   received at the recipient, and he said no.

20       It does matter that there's formatting.  It does matter

21   that the message is not the same.  One of the points that they

22   were trying to make with their patent was if I send you the

23   VCR tape, I am directly sending you exactly that message.  It

24   is a letter with a VCR tape included.

25       And I can't review that because that message is not

1    compatible with anything that I have.  I have to then go out

2    and get the means to translate it, get the means to make sure

3    that I can read it, and it is the same message.

4        The claim construction is agreed.  And it's just a matter

5    of applying patent law.  When you say, "'a' private message,"

6    and then for antecedent basis, you refer back to the same

7    message, it has to be the same message.

8        MR. CALDWELL:  I'm sorry if I misspoke.  There's not

9    a dispute for Your Honor under claim construction principles

10   that would resolve this issue of whether the format can

11   change.  That's not -- it's not a matter of law, like a

12   *Markman* -- *Markman*-type issue.  It is still dispute amongst

13   the -- the witnesses.  And although you've been told many

14   times that our expert made an admission, what his answer

15   was -- and I'm just reading from his transcript -- they're

16   formatted differently so they wouldn't be identical.

17       Then his next answer when someone asked it again, "they're

18   formatted differently.  They're not identical."

19       It's the exact same point I'm -- I'm making to you.  The

20   private message under this agreed construction, it's just

21   disputed as to whether the private message makes it all the

22   way there.  And I would -- certainly there's nothing that's

23   not credible about Dr. Jones's position on that because of the

24   format that's carrying it changes.

25       THE COURT:  All right.  Third?

1          **MS. KEEFE:**  Third, Your Honor, is a little bit more

2     complicated limitation but a relatively simple issue.  This is

3     all regards (sic) the very last limitation of the claim which

4     requires that the communication being sent in real time and

5     via the Internet network and the second participator computer

6     internally determines whether or not the second participator

7     computer can present the prestored data.

8          This is the notion that when the message is sent from User

9     A to User B, the computer at User B has to decide whether or

10    not it can display the information.

11         Dr. Jones was asked what is the participator computer.

12    And he said it was the device, whether it be a computer or a

13    mobile phone or anything like that, running Messenger

14    software.

15         But then when he applied the claim to Facebook's facts, he

16    said that he found infringement because Facebook had to go

17    outside of the Messenger software in order to play the device.

18    You had to look for an agent that was already on the computer.

19         And his argument seemed to be that if you have to go

20    outside of the participator's software, you're infringing the

21    claim element.  But that's not what the claim requires.  The

22    claim requires that the entire computer be viewed to see

23    whether or not information can be viewed.

24         And when asked whether or not Dr. Jones' opinion would be

25    different if the claim is interpreted to require that the

1    second participator computer look at all the software on the

2    computer, not just what's in the Messaging app, he agreed that

3    he hasn't offered an opinion under that construction.

4        And, in fact, it makes sense that he didn't because

5    earlier in the deposition, Dr. Jones admitted that the

6    computers of the time had the ability to use applications on

7    the computer itself to play these different types of

8    multi-media.  And that's at page 86, starting at line 22,

9    through page 87 at line 14 of Dr. Jones' deposition wherein he

10   admits that the computer may actually have software on it that

11   is capable of playing, for example, MP3 audio, correct?

12       "Yes."

13       "Q.  Most likely in June of 2013" -- that's when the

14   patent issued -- "a computer probably did in fact include code

15   to play MP3 audio, correct?"

16       "A.  It was likely, yes."

17       And so here, Dr. Jones is reading the claim to try to say

18   that you have to look solely outside of the participator

19   software, not outside the participator computer.

20       And, in fact, if he were required to look at everything on

21   the participator computer, he actually has no opinion

22   regarding infringement because, in fact, as he's already

23   testified in 2013, the computers were capable.

24            THE COURT:  Response.

25            MR. CALDWELL:  Yes, Your Honor.

1          So first of all, this is one where there's not a claim

2     construction pending in front of Your Honor, and I don't

3     believe there's an agreed construction or anything like that,

4     so we're purely in what does the evidence show and what could

5     a jury reasonably conclude.

6          So, for example, I raise that not to be redundant but

7     because Ms. Keefe made it sound like it was some

8     accomplishment that he didn't offer an opinion on a

9     construction that nobody has asked for.

10         The next point is I would say it's also not some

11    accomplishment that Dr. Jones admitted the computer might have

12    other software that could play MP3's.

13         Where the rubber meets the road here is Facebook is

14    saying, well, oh, my gosh, you can't look to something else

15    that's on the computer that might be able to play this

16    content.

17         And, in fact, I'm sure Your Honor has seen the *Vitronix*

18    case from the Federal Circuit.  I think it was from the

19    mid-'90's so it's just been cited a million times, and it has

20    the famous quote, that a construction that reads out a

21    preferred embodiment is rarely if ever correct.

22         And although no one's asking you for a construction

23    per se, that's the implication, that this claim can't cover

24    where some other software on the device would be able to play

25    the media.

1       And in the preferred embodiment of this patent, it even

2   tells you that if the communication software gets something,

3   itself may not be able to -- to access or to render.  It might

4   invoke other software on the computer, such as Netscape

5   Navigator.

6       So, for example, if the communicator maybe couldn't

7   process an HTML page or something else or display a .jpeg, it

8   might invoke this other software, and that's perfectly

9   consistent with the language of the claims because as the

10  software exists at the time that message comes in, it can't

11  play that media.

12      There might be other code that is sitting somewhere on the

13  hard drive that could, but it's not positioned to play that

14  media, and so it goes and invokes what it needs to, which,

15  again, in the case of the preferred embodiment, there's even a

16  (sic) example of running Netscape Navigator off that very

17  device.

18          **MS. KEEFE:**  Your Honor, that's not what the claim

19  says.  That embodiment talks about the fact that there might

20  be something in Netscape Navigator because that embodiment was

21  talking about the difference between the participator software

22  and the participator computer.

23      They chose in claim one to say you have to look to whether

24  or not the participator computer can show it.  That means

25  anything on the participator computer.  And we didn't ask Your

1  Honor for construction because this is the plain language of

2  the claim.

3      And, in fact, this embodiment, the idea, the notion of

4  going outside of the computer is specifically discussed in

5  column 10, lines 45 through 65 of the specification, the

6  notion that when you click on a link, you might have to go off

7  of the computer to obtain an agent in order to view it.

8      It's not dissimilar to what we've all seen when we try to

9  open a attachment that the computer doesn't know what to do

10  with, and so it pops up a window that says, would you like me

11  to go get you an attachment since -- or sorry -- an agent,

12  would you like me to go get you software because I have no way

13  of doing it.

14      So if the -- you have to look at everything on the

15  participator computer itself.  That's using the plain language

16  of the claims themselves, Your Honor.

17              **THE COURT:**  All right.  Four.

18              **MS. KEEFE:**  The last two, Your Honor, have to do with

19  direct infringement and indirect infringement.  With respect

20  to direct infringement, Your Honor, these are apparatus

21  claims.  These are not method claims.  It's not simply a

22  method of using something to accomplish results.

23      These are directly apparatus claims which require a

24  participator computer, a network computer, and a third -- in

25  other words, the second participator computer.

1      There's no dispute that Facebook does not make computers,

2  Facebook does not sell computers.  There's nothing that

3  Facebook directs users that they have to use their computers

4  in a way and, therefore, there is no evidence of direct

5  infringement.

6      There is a passing mention of Facebook's internal use

7  being direct infringement where, say, an employee would be

8  testing the software using Facebook's computers.  But the

9  problem there, Your Honor, is that even if that were to be

10  their only infringement scenario, there is absolutely no

11  evidence of harm based on internal testing or use.

12      In fact, in Dr. (sic) Weinstein's report -- he's their

13  damages expert -- there's no mention of internal testing

14  whatsoever as one of acts of infringement that he uses to find

15  damages.  And that's why, Your Honor, there would be summary

16  judgment of no direct infringement.

17      Beyond that, Your Honor, I think it is important to note

18  that there is no theory of doctrine of equivalents in this

19  case.  In fact, when asked at his deposition, page 15, line 16

20  through page 16, line 5, Dr. Jones admitted that he was not

21  proffering an opinion regarding the doctrine of equivalents.

22      **MR. CALDWELL:**  So your Honor, under 271(a), acts of

23  infringement can be make, use, sell, offer for sale, import,

24  things of that nature.

25      As for 271(a), direct infringement, Facebook at least

1    makes and uses the system.  One who makes a cake doesn't have

2    to grind the flower, right?  You still put together the

3    system, and they have done that.

4        There is a "make" under 271(a).  There is always "use"

5    both for Facebook folks using but also for test case.  And we

6    have repeated evidence in the record the fact that our damages

7    expert didn't reach a 271(a) conclusion based on use is not

8    dispositive of that -- of that --

9        **THE COURT:**  If you go to trial, what are you -- how

10   are you going to satisfy each of the elements of your claim

11   which would include damages?

12       **MR. CALDWELL:**  Well, our claim also -- there's also

13   infringement under indirect infringement, and we don't

14   double-count damages.  So our model is more premised on the

15   larger case, which, of course, is what drives value, when the

16   users -- when the users use the system.  But there is no lack

17   of 271(a), direct infringement.

18       We're not redundantly counting damages in a -- in an

19   alternative model.  I mean, certainly, the -- the revenue

20   generating use is more the larger-volume use by consumers.

21       But there's no doubt that there is 271(a), making and

22   using of the system by Facebook.

23       **MS. KEEFE:**  Your Honor --

24       **MR. CALDWELL:**  We have -- we have lots of

25   testimony -- I mean, I'm happy to submit it, certainly.  But

1    we have lots of testimony of their users admitting that they

2    do test the -- the web messenger testing on the app.

3         **THE COURT:**  -- on the issue of the doctrine of

4    equivalents?

5         **MR. CALDWELL:**  I actually -- and I'm sorry.  I didn't

6    understand counsel's point on that as to whether -- to -- my

7    understanding is we're talking about 271(a), whether Facebook

8    performs acts of direct infringement.  And I didn't understand

9    how that relates, and so I apologize.  I'm not trying to be

10   evasive on that.  I just don't understand.

11      It's not as though we're talking about doctrine of

12   equivalents of some elements that there might be insubstantial

13   differences so I didn't really understand what the point was

14   there.

15        **MS. KEEFE:**  My point, Your Honor, was Facebook does

16   not make computers, period.  And so there is no "making" of

17   the system.  In order to "make" the system, Facebook would

18   have to make the first participator computer --

19        **THE COURT:**  Do each of you have a case that you're

20   relying on for these diametrically opposed uses of the same

21   word?

22        **MS. KEEFE:**  So, Your Honor, I would --

23        **MR. CALDWELL:**  On.

24        **MS. KEEFE:**  -- point you to two case that we actually

25   cite in our brief, which is *Centillion vs. Qwest*

1    *Communications.*  Facebook does not provide the claim system as

2    a whole because Facebook does not provide the participator

3    computers.  And so we're not "making" that system.  We're not

4    providing it.  *Centillion*'s directly on point.  There is an

5    element that's missing.  The reason I brought up DOE was in

6    case they wanted to say, well, you got close enough to it by

7    virtue of the fact that you can download an application.  But

8    that's simply not the case here, Your Honor.

9        Facebook does not make -- and other than internal use, for

10   which there is no damage claimed, Facebook does not --

11   Facebook's users do not use the whole system.  There is no

12   direct infringement.

13            **MR. CALDWELL:**  I see, and I think I better understand

14   the point, although I think it's -- it's not a terribly

15   helpful point for what's at issue here.

16       There are certainly computer systems you can go buy off

17   the shelf, and I have no doubt that Facebook buys servers that

18   someone else manufactures.  But we're talking about a claim

19   with a variety of -- of elements that includes computer

20   system, plurality of computers, and goes on to describe

21   computers that are programmed to have certain functionality.

22       And so our allegations as to "make" are you don't have

23   to -- you don't have to manufacture the transistors in -- in a

24   computer.  You don't have to assemble the base computer.

25   There's just -- and I -- I don't think Facebook would really

1      fundamentally disagree with that.

2          There are many computer system claims that are infringed

3      daily, and people infringing them by making them do certain

4      functionality that's required by the claim.

5          And our allegation is that Facebook puts on the

6      programming that meets the step of the claims, and that is a

7      "make" of the system.  They don't to have actually manufacture

8      the hardware.  And so I think because I -- very confident

9      about that aspect, I don't think that the doctrine of

10     equivalents notion of suggesting that they get close to

11     manufacturing hardware -- I think that that sort of misses the

12     mark on what the issue is for me.

13             **THE COURT:**  Are you familiar with the *Centillion*

14     case?

15             **MR. CALDWELL:**  I am not, Your Honor.  I know there

16     are plenty of cases that we have -- that indicate testing is

17     an appropriate use, and so I'm not trying to steer the court

18     away from your question.  My point is that in addition to

19     "make," we still have 271(a) under -- under testing.

20             **THE COURT:**  All right.

21             **MS. KEEFE:**  *Centillion* is directly on point, Your

22     Honor.  Facebook doesn't make computers.

23         The claims that he's talking about to computer system, you

24     could have claimed a system wherein there is "an application

25     that."  You don't have to claim the computers.  Here, they did

1    claim a system with computers.  Facebook does not make.

2         I think Your Honor understands the rest.

3              **MR. CALDWELL:**  I guess --

4              **MS. KEEFE:**  Would you like me to address indirect

5    infringement?

6              **THE COURT:**  Yes.

7              **MS. KEEFE:**  So for indirect infringement, Your Honor,

8    I think this is an interesting and unique case.  The patent

9    here does not issue until June 4th, 2013.  The complaint was

10   filed June 2nd, 2015, and the expiration of the patent is

11   April 1st, 2016, as agreed by Dr. Jones, their expert.

12        There is no dispute that there was no pre-case notice of

13   the patent.

14        Inducement requires not just an act of infringement but an

15   intent to infringe, not an intent to cause the act which

16   causes the infringement but an actual intent to infringe.

17        If Facebook did not even know about the patent, it cannot

18   have the requisite intent to infringe and, therefore, there

19   can be no inducement, at least from the period of June 4th,

20   2013, to the period of June 2nd, 2015.

21        And, in fact, Dr. Jones admits that there is no evidence

22   that Facebook knew of the patent before the filing of the

23   lawsuit.

24        In fact, the only argument is that there was an (sic)

25   willful blindness.  But the problem here, Your Honor, is that

1    the case might have been filed in June of 2015, but when the

2    case was filed, it's a very, very thin complaint.  And in that

3    complaint, there is not a single mention of an individuated

4    claim.  There is simply an allegation of infringement of all

5    four of the patents.  No individual claims are brought out.

6    No theory of infringement is brought out either.

7        In fact, because of the motion to transfer, there was

8    never an actual claim chart or allegation of specific

9    infringement brought to Facebook's attention until October

10   19th, 2016, after the patent had expired.

11       And so what we have here is a case where Facebook never

12   had pre-suit notification of its infringement and did not have

13   post-suit notification of infringement allegations until

14   October 19th, 2016.

15           **THE COURT:**  What's your best case for the timing

16   issue?

17           **MS. KEEFE:**  My best case for the timing issue, Your

18   Honor, the *Commil* case specifically talks about having to have

19   the intent.  That's *Commil vs. Cisco Systems*.

20           **THE COURT:**  That's a pretty basic proposition.

21           **MS. KEEFE:**  Very basic.

22           **THE COURT:**  What you're making -- what you're arguing

23   here is --

24                   (Simultaneous colloquy.)

25           **THE COURT:**  -- something pretty distinct --

1            **MS. KEEFE:**  It is, Your Honor.

2            **THE COURT:**  -- because there are plenty of courts

3    that have said once the lawsuit gets filed, if you continue to

4    infringe, you know, you're on notice.

5        You're making some very specific arguments with respect to

6    filing dates and disclosure dates.  Anything -- is there any

7    case that talks about it in the terms that you've outlined?

8            **MS. KEEFE:**  I have not seen a case that has facts

9    directly analogous to what I'm talking about here, Your Honor.

10   This is a very unique situation.

11       But I do think that the willful blindness cases all talk

12   about something after receiving allegations of infringement,

13   true notions of how we would know that we're infringing, not

14   simply notice of the patent.  Notice of the patent is not

15   notice of infringement and the way that they're saying that

16   the claims apply.

17       And so you can't just wrap in the notion that now that

18   you're aware of the patent, you are hereby intending to

19   infringe.  The fact that we did not change our product after

20   we were sued does not mean that we were willfully blind

21   because we didn't even know what the true allegations of

22   infringement were until after the patent expired.  So there

23   can't -- there's no evidence of intent to infringe.

24           **THE COURT:**  Response.

25           **MR. CALDWELL:**  I -- I think Your Honor's question is,

1   I think, where I'd like to start because I think that

2   that's -- kind of really cuts to the -- the quick of this

3   issue, certainly once a complaint is on file.

4        I think it would be remarkable to say that once someone

5   has been sued on a patent, you can't have indirect

6   infringement such as inducement following that.

7        And we don't even think willful blindness is required post

8   filing.  I believe the law doesn't require that.

9        So post filing of the lawsuit, I -- I just -- I can't even

10  understand why there would be a dispute that induced

11  infringement isn't eligible post filing of the -- of the

12  lawsuit.  Pre filing of the lawsuit, we have a lot of

13  evidence -- and, obviously, we're -- not to belabor a

14  uncomfortable subject, but we're a little tight on space in

15  the letter briefs, but we have a lot of evidence of what seems

16  to be actually a purposeful practice at Facebook to avoid

17  seeing other people's patents and consider them -- and

18  considering them.  So witness after witness that just is

19  like --

20            **THE COURT:**  Is that illegal?

21            **MR. CALDWELL:**  Is it illegal?  Certainly not in the

22  criminal context.  I think that is -- I think that it would

23  defeat summary judgment on the issue of willful blindness for

24  prefiling inducement.

25            **THE COURT:**  But it sounds like what you have are a

```
1   generic -- it is a generic approach to how they do business.

2   They're not the only company in the Valley that does that.

3        MR. CALDWELL:  I -- that -- I'm extremely familiar

4   with that -- with that concern, but I also know that this

5   issue of willful blindness has gone to the jury before for

6   that -- for that reason.

7        THE COURT:  Has there been any opinions from the

8   Federal Circuit on the top?

9      Can a generic business practice be sufficient?  One way or

10  the other?

11     Has -- if they've gone to the jury, I'm sure they've

12  gotten appealed.  Has the Federal Circuit written on that?

13       MR. CALDWELL:  I don't know, Your Honor.  I'm -- I

14  would -- actually super-curious to know at this point, and I

15  would be happy to submit something if --

16       THE COURT:  Well, in your opposition, I mean,

17  that's -- that's the question I'm going to ask.

18       MR. CALDWELL:  I would -- I would expect that you

19  would.  I agree, and I don't know the answer to that as we --

20  as we sit here today, I mean, given what we're covering in

21  the -- in the scope of the letter brief.

22     I mean, what -- it seemed that the focus -- because as --

23  as we saw kind of -- this was maybe the fifth of sixth bolded

24  heading under their letter, and it's painting with a broad

25  brush, hey -- first of all, we thought there can't be direct.
```

1   By the way, now we think there can't be indirect infringement.

2      And I mean, given the considerations of space, like, we

3   were pointing out that it's very well settled, it seems, once

4   a complaint is on file, you certainly have indirect

5   infringement, and that seemed, given the -- the space

6   constraints, the succinct way to point out that obviously

7   indirect infringement can't just be --

8           THE COURT:  I mean, there are complaints, and there

9   are complaints, right?

10      The very first patent case I saw, I was shocked at how

11   little the complaint said.

12      Now we require a bit more than that.

13           MR. CALDWELL:  And there's certainly been evolution

14   with *Iqbal* and *Twombly* and all that -- that sort of case law

15   but still, it's one thing to be thinking about a world in

16   which people say, hey, let's avoid finding out about other

17   people's patents, and then people say we don't know about it.

18      Even under pre-*Iqbal* or *Twombly* kind of standards or more

19   generally type patent pleadings, which are the form pleadings

20   at the time, when you say, this is this patent we believe

21   you're infringing --

22           THE COURT:  Right, but at the time you filed the

23   lawsuit, how many claims had you brought?

24           MR. CALDWELL:  I don't think there were claims that

25   are identified.

1          **THE COURT:**  How many patents?

2          **MR. CALDWELL:**  Was it?  Four or five?

3          **MR. McCARTY:**  Four.

4          **MR. CALDWELL:**  Four.

5          **THE COURT:**  Well, it's not the worst I've seen.

6          **MS. KEEFE:**  And within those four patents, Your

7    Honor, there were in excess of 600 claims that were at --

8    possibly at issue.

9          The -- I would point, Your Honor beyond *Commil*, there's

10   the *Global-Tech Appliances vs. SEB* case, which is actually

11   cited within *Commil* and the pin quote is SB -- sorry --

12   *Global-Tech*, 131 Supreme Court 2060 at 2068.  And the quote

13   is, like induced infringement, contributory infringement -- so

14   they are equating the two -- requires knowledge of the patent

15   in suit and knowledge of patent infringement, citing all the

16   way back to the *Aro Manufacturing*.

17         So it's just the notion that you know about the patent.

18   You have to know about the infringement.  And I actually have

19   the complaint here, Your Honor.  And it was pre a lot of the

20   *Iqbal/Twombly* cases, but the entire complaint is just short of

21   ten pages.  And the only allegations are lumped together as

22   you infringe the patents.  And there is no direct allegation

23   of what the infringement is or would be.

24         In terms of the question that Your Honor asked, has the

25   court addressed the specific issue of a business practice

1    being enough, I don't know that I've seen it in the context

2    directly of inducement or indirect infringement but it has

3    been addressed with respect to willfulness, which has a

4    similar intent to fringe issue.

5         And there, the courts have said that continuing a business

6    practice is not enough.  It's not enough to be the egregious

7    behavior that willfulness requires.

8              MR. CALDWELL:  But, see, the -- then the willfulness

9    law has also headed downed a path of saying words like

10   "characteristic of a pirate" and what-not, so that -- I think

11   that kind of makes the point here.

12        We're not talking about that burying your head in the sand

13   prefiling is characteristic of a pirate in the willfulness

14   context that's -- so I don't think that case law is terribly

15   helpful to point to something that doesn't meet the

16   willfulness standard when what we're talking about is the

17   standard applicable to 271(b) or (c), indirect infringement.

18             THE COURT:  All right.  Talk to your client.  I need

19   to know what you want to do with your motion to dismiss.

20             MS. KEEFE:  And so the question that I need to answer

21   for Your Honor is whether I would withdraw the motion to

22   dismiss under 12(b)(1) in favor of the letter brief --

23   sorry -- the -- the request we made in the letter --

24             THE COURT:  In favor -- Look, currently, it's under

25   submission.

1      **MS. KEEFE:**  Correct.

2      **THE COURT:**  If I convert it, that's the only motion

3  you get.

4      I will give you the option to withdraw it and resubmit it

5  as part of your motion for summary judgment.

6      **MS. KEEFE:**  Understood, Your Honor.

7      Do you want me the ask her right now?  I think I can get

8  an answer.

9      **THE COURT:**  You should.  Yes.

10                 (Pause in the proceedings.)

11      **MS. KEEFE:**  Your Honor, Facebook would prefer at this

12  point to withdraw the motion to dismiss with the understanding

13  that it can be woven into the single motion for which we are

14  very well aware of the page limits.  And we will make

15  decisions based on which other pieces are included to make

16  sure that we don't go over that -- those page limits.

17      **THE COURT:**  All right.  Request granted.

18      Now, when can --

19      **MS. KEEFE:**  We appreciate Your Honor's guidance.

20      **THE COURT:**  When can you get your motion on file?

21                 (Pause in the proceedings.)

22      **MS. KEEFE:**  Could we have two weeks, Your Honor?

23      **THE COURT:**  You can.

24      **MS. KEEFE:**  That would be fine, Your Honor.

25      Thank you.

1        **THE COURT:**  So that would be February 11th.

2        **MS. KEEFE:**  Thank you, Your Honor.

3        **THE COURT:**  Typically you would have two weeks to

4    respond.

5      Do you need more than that?

6        **MR. CALDWELL:**  I do know that at least as -- speaking

7    for myself, and I don't mean to be selfish about this in any

8    way -- I am taking my kids on their -- my wife and my kids are

9    going skiing on what's their winter break, which is right in

10   the middle of that.  Kind of it starts basically Valentine's

11   Day and goes for a few days, so we may want at least a few

12   more days if that would be okay with Your Honor.

13       **MS. KEEFE:**  No opposition, Your Honor.

14              (Pause in the proceedings.)

15       **MR. McCARTY:**  Your Honor, just one question, and I

16   think it will help us understand how much time we would need.

17   If -- I mean, are you granting permission to file -- Facebook

18   to file a motion on seven issues?

19       **THE COURT:**  So I'm not telling them --

20       **MR. McCARTY:**  Okay.

21       **THE COURT:**  -- what -- they cannot file -- you cannot

22   file a motion on a topic that was not raised.

23       **MS. KEEFE:**  Understood, Your Honor.

24       **THE COURT:**  But they don't to have bring a motion --

25   so they can bring it on all, or they can bring it on fewer.

 1              **MR. McCARTY:**  Okay.

 2              **THE COURT:**  The question is space.

 3              **MR. McCARTY:**  Sure.

 4              **THE COURT:**  And, again, my view is that some things

 5     are stronger than others.  People have to pick their battles

 6     and figure out what they want to do.  And you don't properly

 7     brief a topic, likelihood of granting -- having it granted is

 8     probably not very high --

 9              **MR. McCARTY:**  Okay, Your Honor.

10              **THE COURT:**  -- 'cause I'm not going to do your

11     homework for you.

12              **MR. McCARTY:**  Understood.

13              **THE COURT:**  So what I can tell you is it will be

14     within the page limits.

15              **MR. McCARTY:**  Yes, Your Honor.

16              **THE COURT:**  So --

17              **MR. McCARTY:**  So back to the question you asked my

18     colleague about timing.  If -- If possibly, could we have 21

19     days, just given his time frame and -- or even 18.  It sounds

20     like we just maybe need a few extra days.

21              **THE COURT:**  It's fine.  You all have to remember that

22     you have a trial date.

23        And so you also have deadlines with respect to that as

24     well.

25              **MS. KEEFE:**  That's right, Your Honor.  The trial's

1   currently set in June.

2           **MR. CALDWELL:**  June 10th, I think.

3           **MS. KEEFE:**  Yes.

4           **THE COURT:**  All right.  So that would be March 1st.

5       Reply?

6           **MS. KEEFE:**  We can do it in the week normally

7   allowed, Your Honor, in order to make sure that we keep things

8   moving.

9           **THE COURT:**  Okay.  March 8th.

10      We'll set it for hearing April 2nd.

11      That does cut it close.

12          **MS. KEEFE:**  Would Your Honor be available the prior

13  week, if you think that would help?

14          **MR. CALDWELL:**  Actually, not sure that I am.

15          **THE COURT:**  My question is how much time to get

16  through it.

17          **MS. KEEFE:**  Understood, Your Honor.

18      I wasn't trying to jam you up, I was just --

19          **THE COURT:**  I mean -- I'm available.  I just want to

20  make sure I have enough time to get through it.

21      And potential, attention, you know, we're looking at a lot

22  of issues.  I don't know what you're going to file.  If I can

23  advance it.  I'll advance it.

24          **MS. KEEFE:**  Understood, Your Honor.  So for right

25  now, it's set for April 2nd, right?

1            **THE COURT:**  Correct.

2            **MS. KEEFE:**  In the morning or the afternoon, Your

3 Honor?

4            **THE COURT:**  2:00 o'clock calendar.

5            **MS. KEEFE:**  Thank you, Your Honor.

6            **THE COURT:**  So here's the thing:  Your pretrial

7 statement is due May 10th.  That means that you have to

8 exchange exhibits by April 12th.  You going to be prepared to

9 do that?

10            **MS. KEEFE:**  We can, Your Honor.  It may mean that

11 there are exhibits which will fall out depending on how Your

12 Honor rules on issues, but we can over-include to make sure

13 that we're complying with Your Honor's timing.

14            **MR. CALDWELL:**  Same -- same for this side.

15            **THE COURT:**  All right.

16       Just a reminder, I do require a separate statement.

17            **MS. KEEFE:**  Yes, Your Honor.

18            **THE COURT:**  You all know what that is?

19            **MR. CALDWELL:**  For the summary judgment?

20            **MS. KEEFE:**  Yes, Your Honor.

21            **MR. CALDWELL:**  Yes, Your Honor.  That --

22            **MS. KEEFE:**  Including the attestations and everything

23 else, Your Honor.  Yes.

24            **THE COURT:**  All right.

25       Make sure that you are giving an editable form of these

1   documents to opposing counsel.  No one should have to retype

2   any of that stuff.  All right?

3           MS. KEEFE:  Very easily done, Your Honor.

4           THE COURT:  Okay.

5       And then my estimate from what I last read is that if this

6   case goes trial, we're looking at a total of one week; is that

7   right?

8           MS. KEEFE:  I think that works, Your Honor.

9           MR. CALDWELL:  Yes, Your Honor.

10          THE COURT:  Well, now -- Hmm.  I just agreed to go to

11  the conference that week in Colorado for the patent bar so we

12  aren't going to try the case that week or I'm going to

13  disappointment a lot of patent lawyers.

14          MS. KEEFE:  Okay.

15                  (Pause in the proceedings.)

16          MS. KEEFE:  What day would Your Honor prefer?

17                  (Pause in the proceedings.)

18          THE COURT:  Well, we can do it the following week,

19  17th?

20          MS. KEEFE:  So I have -- I have a meeting in New York

21  on the 20th that's been set for a long time, but I -- I think

22  I can get out of it, Your Honor.

23          MR. CALDWELL:  That week's fine, Your Honor.

24          THE COURT:  All right.  Let's try the following week

25  on the 17th.

1              **MS. KEEFE:**  Thank you, Your Honor.

2              **THE COURT:**  We'll keep all the other stuff the same,

3     though, so that we're all prepared to go.

4              **MS. KEEFE:**  That makes sense, Your Honor.

5              **THE COURT:**  And just for planning purposes -- Well,

6     I'll talk to you about it -- I'll talk to you about it after

7     the summary judgments, but we may just go long days to get a

8     little bit of extra time so we can get it done.

9              **MS. KEEFE:**  That's fine, Your Honor.

10             **THE COURT:**  All right.  The OSC's are discharged.

11             **MS. KEEFE:**  Thank you, Your Honor.

12             **MR. CALDWELL:**  Thank you, Your Honor.

13             **THE COURT:**  We're adjourned.

14             **MS. KEEFE:**  Thank you, Your Honor.

15             **MR. McCARTY:**  Thank you, Your Honor.

16               (Proceedings were concluded at 3:54 P.M.)

17                              --o0o--

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4

5            I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    I further certify that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in which this

9    hearing was taken, and further that I am not financially nor

10   otherwise interested in the outcome of the action.

11

12   _____

13        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14               Wednesday, January 30, 2019

15

16

17

18

19

20

21

22

23

24

25