REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Heidi L. Keefe (SBN 178960)
Mark R. Weinstein (SBN 193043)
Lowell D. Mead (SBN 223989)
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Phillip E. Morton (*pro hac vice*)
Emily E. Terrell (SBN 234353)
Stephen C. Crenshaw (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

Michael G. Rhodes (SBN 116127)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

**Attorneys for Defendant
FACEBOOK, INC.**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| WINDY CITY INNOVATIONS, LLC | Case No. 4:16-cv-01730-YGR |
| Plaintiff, | |
| v. | **DEFENDANT FACEBOOK, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| FACEBOOK, INC., | |
| Defendant. | **Date:** April 2, 2019 |
| | **Time:** 2:00 p.m. |
| | **Ctrm:** Courtroom 1, Fourth Floor |
| | **The Honorable Yvonne Gonzalez Rogers** |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ............................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

I.     INTRODUCTION ......................................................................................................... 1

II.    LEGAL FRAMEWORK FOR SUMMARY JUDGMENT ...................................... 2

III.   WINDY CITY LACKS STANDING ........................................................................ 2

     A.    Factual Background Relevant to Windy City's Lack of Standing.............................. 2

          1.    Inventor Daniel L. Marks, AIS, and UtiliCorp ..................................... 2

          2.    AIS and UtiliCorp Entered Into a Work For Hire Agreement, Which Assigned AIS's Rights in the '491 Patent Family to UtiliCorp...................... 3

          3.    The UtiliCorp Chat System Is the Invention of the '491 Patent Family.......... 4

     B.    Legal Framework .................................................................................. 4

     C.    Windy City Never Acquired Rights to the '245 Patent ......................................... 5

          1.    The Work For Hire Agreement is a Valid, Enforceable Contract .................. 5

          2.    The Work For Hire Agreement Established UtiliCorp's Ownership of the Alleged Invention of the Patents-in-Suit ............................................. 6

              a.    The Work For Hire Agreement Contains an Automatic Assignment ...................................................................... 7

              b.    Dr. Marks' Work Fell Within the Scope of the Assignment .............. 8

          3.    Windy City Never Owned the Asserted Patents and Thus Lacks Standing .................................................................................. 9

IV.   THE '245 PATENT IS INVALID PURSUANT TO 35 U.S.C. § 101................................ 10

     A.    The '245 Patent ................................................................................... 10

     B.    The '245 Patent Claims an Abstract Idea Implemented on Generic Components ....................................................................................... 10

          1.    Alice Stage 1: The Asserted Claims are Directed to an Abstract Idea .......... 10

          2.    Alice Stage 2: The Asserted Claims Do Not Add Patentable Weight .......... 13

V.    FACEBOOK DOES NOT INFRINGE THE '245 PATENT ........................................ 15

     A.    Facebook Messenger Does Not Literally Infringe Any Claim ................................. 15

          1.    Facebook Messenger Does Not Meet the "Real Time" Limitation ............... 15

          2.    Facebook Messenger Does Not Meet "The Private Message" Limitation................................................................................... 17

     B.    Facebook Does Not Directly Infringe ...................................................... 18

     C.    Facebook Does Not Indirectly Infringe the '245 Patent ........................................ 21

          1.    Facebook Is Not Liable for Indirect Infringement ...................................... 21

          2.    Facebook Is Not Liable for Contributory Infringement ............................... 23

**Table of Contents**
(continued)

**Page**

VI.    CONCLUSION.................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC,*
  625 F.3d 1359 (Fed. Cir. 2010)..................................................................................4

*Acceleration Bay LLC v. Activision Blizzard, Inc.,*
  324 F. Supp. 3d 470 (D. Del. 2018)...................................................................19, 20

*Accenture Global Servs. GmbH v. Guidewire Software, Inc.,*
  728 F.3d 1336 (Fed. Cir. 2013)................................................................................13

*Affinity Labs of Tex., LLC v. DIRECTV, LLC,*
  838 F.3d 1253 (Fed. Cir. 2016)..........................................................................12, 14

*Alarm.com, Inc. v. SecureNet Techs. LLC,*
  345 F. Supp. 3d 544 (D. Del. 2018)..........................................................................21

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  134 S. Ct. 2347 (2014)........................................................................................10, 13

*Allvoice Dev. U.S., LLC v. Microsoft Corp.,*
  988 F. Supp. 2d 1248 (W.D. Wash. 2013)................................................................23

*Amelco Elec. Co., Inc. v. Arcole Midwest Corp.,*
  351 N.E.2d 349 (Ill. App. Ct. 1976) .......................................................................5, 6

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)....................................................................................................2

*Apple, Inc. v. Ameranth, Inc.,*
  842 F.3d 1229 (Fed. Cir. 2016)................................................................................12

*AquaTex Indus., Inc. v. Techniche Solutions,*
  419 F.3d 1374 (Fed. Cir. 2005)................................................................................24

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
  512 F.3d 1338 (Fed. Cir. 2008)................................................................................17

*Bd. of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
  583 F.3d 832 (Fed. Cir. 2009)...............................................................................7, 9

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
  316 F.Supp.3d 1138 (N.D. Cal. 2018) ...............................................................11, 15

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)....................................................................................................2

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*Centillion Data Sys., L.L.C. v. Qwest Commc'ns Int'l, Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011)........................................................................18, 19

*Centrak, Inc. v. Sonitor Techs., Inc.*,
    No. 14-183-RGA, 2017 WL 3730617 (D. Del. Aug. 30, 2017)....................................20

*Commil USA, LLC v. Cisco Sys., Inc.*,
    135 S.Ct. 1920 (2015)..........................................................................................21

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
    517 F.3d 1284 (Fed. Cir. 2008)........................................................................5, 6, 7

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014).............................................................................13

*Desper Prods., Inc. v. QSound Labs, Inc.*,
    157 F.3d 1325 (Fed. Cir. 1998)...............................................................................2

*Detroit Tigers, Inc. v. Ignite Sports Media, LLC*,
    203 F. Supp. 2d 789 (E.D. Mich. 2002)....................................................................5

*DSU Med. Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006).............................................................................21

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)........................................................10, 11, 13, 15

*Elson v. State Farm Fire & Casualty Co.*,
    691 N.E.2d 807 (Ill. App. Ct. 1998) .........................................................................7

*FilmTec Corp. v. Allied Signal Inc.*,
    939 F.2d 1568 (Fed. Cir. 1991)........................................................................5, 7, 8

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010).............................................................................23

*Immersion Corp. v. Fitbit, Inc.*,
    313 F. Supp. 3d 1005 (N.D. Cal. 2018) ..................................................................13

*Intell. Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017).............................................................................11

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018).............................................................................12

**TABLE OF AUTHORITIES**
**Continued**

**Page(s)**

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000)........................................................................15

*Lynge v. Kuntsmann*,
418 N.E.2d 1140 (Ill. App. Ct. 1981) .................................................................5

*MHL Tek, LLC. v. Nissan Motor Co.*,
655 F.3d 1266 (Fed. Cir. 2011).........................................................................4

*Morg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016).......................................................................14

*MyMail, Ltd. v. America Online, Inc.*,
476 F.3d 1372 (Fed. Cir. 2007).......................................................................16

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003).......................................................................16

*Parallel Networks Licensing, LLC v. Int'l Bus. Mach. Corp.*,
No. 13-2072 (KAJ), 2017 WL 1045912 (D. Del. Feb. 22, 2017) (Jordon, J. by
designation)....................................................................................................24

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
855 F.3d 1322 (Fed. Cir. 2017).........................................................11, 12, 13

*Ricoh Co. v. Quanta Comput. Inc.*,
550 F.3d 1325 (Fed. Cir. 2008).......................................................................20

*Rite-Hite Corp. v. Kelley Co. Inc.*,
56 F.3d 1538 (Fed. Cir. 1995) (*en banc*) ..........................................................4

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
215 F.3d 1246 (Fed. Cir. 2000).......................................................................18

*Speedplay, Inc. v. Bebop, Inc.*,
211 F.3d 124 (Fed. Cir. 2000).......................................................................5, 7

*Stuckrath v. Briggs & Turivas*,
161 N.E. 91 (Ill. 1928)......................................................................................5

*SuperCell Oy v. Gree, Inc.*,
No. 17-cv-05556-YGR, 2018 WL 1609584 (N.D. Cal. Apr. 3, 2018) .............10, 12, 13

*Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*,
594 F.2d 730 (9th Cir. 1979) ............................................................................2

## TABLE OF AUTHORITIES
### Continued

**Page(s)**

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016)............................................................................13, 14

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012)..................................................................................24

*TV Interactive Data Corp. v. Microsoft Corp.*,
  No. C 02 02385 JSW, 2005 WL 1910929 (N.D. Cal. Aug. 10, 2005) ..........................24

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)..............................................................11, 12, 13, 15

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014)....................................................................................13

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009)..................................................................23, 24, 25

**Statutes**

35 U.S.C. § 101............................................................................................1, 10, 15, 25

35 U.S.C. § 261..........................................................................................................6

35 U.S.C. § 271(c)..............................................................................................24, 25

**Other Authorities**

Fed. R. Civ. P. 56....................................................................................................1, 2

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on April 2, 2018 at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Yvonne Gonzalez Rogers, Defendant Facebook, Inc. will, and hereby does, move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 that (1) Plaintiff Windy City Innovations, LLC lacks standing; (2) U.S. Patent No. 8,458,245 is invalid under 35 U.S.C. § 101; and (3) Facebook does not infringe the '245 patent because (i) messages are not being sent in "real time," as properly construed; (ii) Facebook recipients never receive the same "private message" that was originally sent; (iii) there is no direct infringement because Facebook does not provide computers; (iv) there is no indirect infringement because Facebook lacked the required knowledge; and (v) there is no contributory infringement because Facebook Messenger has substantial non-infringing uses.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

What started as a case involving well over 800 claims is now down to a single independent claim and a handful of dependents from just a single patent. Each remaining claim is directed to a very narrow type of chat functionality, born from an online chat system commissioned by a third-party power company, UtiliCorp United, Inc., over 20 years ago. Windy City never acquired rights to the chat system from UtiliCorp, thus destroying standing. Moreover, the patent itself, and all discovery to date, make clear that chat, the internet, messages and multimedia were all old, standard technologies by the time of the patent. The claims add nothing to the standard idea of communicating and possibly having to obtain a translator or other device in order to read the message. Thus, they are ineligible for patenting. Beyond that, the claims themselves went through seven years of substantial prosecution, with many narrowing limitations added in order to survive both original prosecution and the IPR. The narrow claims described UtiliCorp's Power Quality Chat, but do not describe Facebook Messenger. As such, Windy City cannot prove infringement, and summary judgment is appropriate. Facebook has taken the Court's admonition to heart and has narrowed its requests to those that most clearly have no factual issue and/or require the Court's application of legal principles. We thank the Court for its time and attention.

## II.   LEGAL FRAMEWORK FOR SUMMARY JUDGMENT

"Summary judgment is as appropriate in a patent case as it is in any other case." *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998) (citation omitted). Summary judgment is appropriate if there are no genuine disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). For issues where the opposing party has the burden of proof, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The burden then shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250 (internal quotation marks omitted). Although the Court must view the facts in the light most favorable to the non-moving party, mere conclusory or speculative testimony cannot defeat summary judgment. *See id.* at 255; *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). If the nonmoving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## III.   WINDY CITY LACKS STANDING[1]

### A.   Factual Background Relevant to Windy City's Lack of Standing

#### 1.   Inventor Daniel L. Marks, AIS, and UtiliCorp

Dr. Marks is the sole inventor of U.S. Patent No. 5,956,491 and its related applications (the "'491 Patent Family"). (Supporting Separate Statement ("SS") Fact 1.) The '245 patent falls within the '491 Patent Family. (SS, Facts 2, 3.) Dr. Marks was an employee of American Information

---

[1] Windy City's Complaint asserted U.S. Patent Nos. 8,407,356, 8,458,245, 8,473,552 and 8,694,657. Windy City currently only asserts claims from the '245 patent. The remaining claims were found unpatentable in *inter partes* review, or were not included in Windy City's expert reports. Because Windy City never formally dismissed the '356, '552, and '657 patents, this motion seeks a ruling that Windy City lacks standing with respect to all four patents in the complaint.

Systems, Inc. ("AIS") from approximately March 1995 through December 1995. (SS, Fact 4.) During the summer of 1995, AIS was hired by a power company called UtiliCorp to develop an online chat system. (SS, Facts 6-8; *see also* Ex. 2, the "Work for Hire Agreement".)[2] According to Dr. Marks, that UtiliCorp chat system "became the subject of the '491 Patent." (Ex. 1, Marks Tr. at 145:18-19.)

### 2. AIS and UtiliCorp Entered Into a Work For Hire Agreement, Which Assigned AIS's Rights in the '491 Patent Family to UtiliCorp

On May 17, 1995, AIS sent a Work for Hire Agreement to UtiliCorp representing

(Ex. 2 at WC-00023842 (highlighting added); *see* SS, Fact 9.)

, thereby accepting the terms offered by AIS. (*See* SS, Fact 8.) The parties then began work. (*See* Ex. 1, Marks Tr. at 194:1-9.)

Over the next several months, Dr. Marks, on behalf of AIS, developed the UtiliCorp Power Quality Chat system to                                                    . (SS, Fact 10.) During that time, AIS and UtiliCorp

. (*See* Ex. 1, Marks Tr. at 222:3-223:4; 237:21-239:5.) The UtiliCorp Power Quality Chat system designed and developed by Dr. Marks had the features described in the Work for Hire

---

[2] All exhibits referenced herein are attached to the Declaration of Phillip E. Morton. With respect to expert reports and deposition transcripts, the parties have met and conferred and agreed to <u>file</u> only excerpted copies of the relevant, cited portions and to jointly provide to the Court one set of highlighted, complete transcripts and reports at the conclusion of briefing on Facebook's motion, pursuant to the Court's Standing Order and its Order setting briefing schedule on Summary Judgment (D.I. 149). The parties believe that this procedure is in accordance with the Court's orders and is the best way to avoid overburdening the Court with multiple copies of voluminous reports and transcripts. If the Court desires copies of the expert reports and depositions transcripts before the close of briefing, the parties will diligently prepare and deliver the copies to chambers.

1   Agreement, namely (i) ████████████████████; (ii) ██████████████; (iii)

2   ████████████████████; (iv) ████████████████████; (iv) ████████

3   ████████████████; (v) ████████████████; (vi) a ████████████;

4   and (vii) ████████████████. (*See* Ex. 2 at WC-00023841, 844; Ex. 1, Marks

5   Tr. at 201:25-205:6.) These facts were known to all involved, including Windy City's attorney, Mr.

6   Peter Trzyna, who has possessed the agreement since ██████████, prior to any purported assignment

7   of the '491 Patent Family to Mr. Trzyna (who later purportedly assigned the family to Windy City).

8   (SS, Fact 15.)

9   **3.    The UtiliCorp Chat System Is the Invention of the '491 Patent Family**

10  Dr. Marks explained that the chat system he developed for UtiliCorp was ████████

11  ████████████████████. (SS, Fact 5; *see also* Ex. 1, Marks Tr. at 118:14-19;

12  145:3-146:3; 198:5-18.) Dr. Marks, as an employee of AIS, created two embodiments of the UtiliCorp

13  Power Quality Chat system. (*See* Ex. 1, Marks Tr. at 198:19-199:9.) Source code for both was

14  submitted to the PTO, and is specifically referenced in the patent specifications. (SS, Facts 16, 17; *see*

15  *also* Ex. 1, Marks Tr. at 118:14-19; 227:7-228:23.) That same source code was ████████████

16  ████████████████. (*See* Ex. 1, Marks Tr. at 228:18-23.)

17  The specification also includes a transcript of a chat session created by the UtiliCorp Power

18  Quality Chat system and "produced in accordance" with the invention of the '491 Patent Family in

19  order "to further exemplify the use of the present invention." (Ex. 4, '245 patent at 11:60-21:17; *see*

20  *also* Ex. 1, Marks Tr. at 229:23-230:13.)

21  **B.    Legal Framework**

22  The question of standing in a patent case is jurisdictional. *Rite-Hite Corp. v. Kelley Co. Inc.*,

23  56 F.3d 1538, 1551 (Fed. Cir. 1995) (*en banc*). "Standing is a constitutional requirement pursuant to

24  Article III and it is a threshold jurisdictional issue." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d

25  1359, 1363 (Fed. Cir. 2010) (citing *Lujan v. Defenders of Wildlif*e, 504 U.S. 555, 560–61 (1992)).

26  "The party bringing the action has the burden of establishing that it has standing to sue for

27  infringement." *MHL Tek, LLC. v. Nissan Motor Co.*, 655 F.3d 1266, 1273-74 (Fed. Cir. 2011).

28  The question of "whether a patent assignment clause creates an automatic assignment or

1    merely an obligation to assign" is an issue of Federal Circuit law. *DDB Techs., L.L.C. v. MLB*
2    *Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008); *see also Speedplay, Inc. v. Bebop, Inc.,*
3    211 F.3d 124, 1253 (Fed. Cir. 2000). Where a contract expressly grants rights in future inventions,
4    "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs]
5    by operation of law." *FilmTec Corp. v. Allied Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991).

6    **C.    Windy City Never Acquired Rights to the '245 Patent**

7    Determining ownership of the asserted patents boils down to two questions (1) Did AIS and
8    UtiliCorp enter into a valid and enforceable contract? and (2) Did that contract assign AIS's interest
9    in the asserted patents to UtiliCorp? The answer to both questions is unequivocally yes.

10    **1.    The Work For Hire Agreement is a Valid, Enforceable Contract**

11    The Work for Hire Agreement bears all of the hallmarks of a binding contract: offer,
12    acceptance, and consideration. AIS offered to build a chat system for UtiliCorp and reduced that offer
13    to writing – the Work for Hire Agreement. UtiliCorp accepted AIS's written offer by signing and
14    returning an executed contract. AIS then ████████████████████████████████████████
15    ████████████████████████████████.

16    UtiliCorp undeniably manifested its assent to be bound by the Work for Hire Agreement by
17    signing and returning it to AIS. Windy City has not produced a copy of the Work for Hire Agreement
18    countersigned by AIS, but this is irrelevant. Under governing Illinois law, "[a] signature on the contract
19    is not a *per se* prerequisite to enforcement." *Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F.
20    Supp. 2d 789, 796 (E.D. Mich. 2002) (citing *Lynge v. Kuntsmann*, 418 N.E.2d 1140, 1144 (Ill. App.
21    Ct. 1981)); *see also Stuckrath v. Briggs & Turivas*, 161 N.E. 91, 94 (Ill. 1928) ("Where a party accepts
22    or acts upon a contract in writing, it is effective as to him even though he does not sign it.") Indeed,
23    the "object of a signature is to show mutuality or assent, but these facts may be shown in other ways,
24    as, for example, by acts or conduct of the parties." *Lynge*, 418 N.E.2d at 1144. Here, AIS manifested
25    its assent by drafting and providing the Work for Hire Agreement, and then performing its obligations
26    thereunder to the satisfaction of UtiliCorp. *See Amelco Elec. Co., Inc. v. Arcole Midwest Corp.*, 351
27    N.E.2d 349, 354 (Ill. App. Ct. 1976) (enforcing agreement under "well settled" contract principles
28    where non-signing party acted upon obligations and performed after receiving signed contract). Dr.

1    Marks confirmed that: (1) ███████████████████████████████████████████████████

2    ██████████████████████ (*compare* Ex. 1, Marks Tr. at 201:25-205:6 *with* Ex. 2 at WC-00023844;

3    *see also* Ex. 1, Marks Tr. at 275:14-276:14); (2) ████████████████████████████████████

4    █████████████████████████████████████████████" (Ex. 1, Marks Tr. at 283:14-20);

5    (3) that ████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████ (*id.* at 198:13-18); and (4) that ███████

7    ██████████████████████████████████████████ to the best of his knowledge

8    (*id.* at 201:19-24). (*See also id.* at 198:5-12; 199:5-200:24; 239:18-22; 240:9-17; SS, Facts 10, 11.)

9    ████████████████████████████████████████████████████████████████████████████████

10   ████████████████████. (SS, Fact 11.)

11         Based on the parties' course of dealing following UtiliCorp's execution of the Work for Hire

12   Agreement – ████████████████████████████████████████████ – it is clear that

13   AIS and UtiliCorp intended to be bound by the provisions of the Work for Hire Agreement.[3] And

14   indeed, under Illinois law, the parties were so bound. *See Amelco Elec.*, 351 N.E.2d at 354.

15         **2.    The Work For Hire Agreement Established UtiliCorp's Ownership of the**

16         **Alleged Invention of the Patents-in-Suit**

17         Having established that the Work for Hire Agreement is indeed a binding contract, the relevant

18   inquiry turns to the scope and terms of the conveyance from AIS to UtiliCorp – an issue on which

19   federal law applies. *See DDB Techs.*, 517 F.3d at 1289-90. Under Federal Circuit precedent, the plain

20   language of the assignment clause constitutes a present assignment of AIS's rights in the chat system

21   to UtiliCorp. During his deposition, Dr. Marks confirmed that ████████████████████████████

22   ████████████████████████ (Ex. 1, Marks Tr. at 145:18-19; *see also* SS, Fact 5.) Accordingly, the

23   Work for Hire Agreement – an instrument in writing – constitutes a valid assignment of all of AIS's

24   rights, title, and interest in the inventions of the '245 patent to UtiliCorp thereunder. *See* 35 U.S.C.

25   _____

26   [3] That AIS and UtiliCorp considered the Work for Hire Agreement to be the operative agreement between them is further supported by Windy City's failure to produce any other agreement between these parties over the last three years of litigation. Dr. Marks and Mr. Trzyna (who was Windy City's

27   30(b)(6) designee on ownership of the patents) both testified in their depositions that they had turned over every document they had to litigation counsel. (*See* Ex. 1, Marks Tr. at 97:24-99:4; Ex. 3, Trzyna

28   Tr. at 106:19-107:10.)

1  § 261.

2            **a.**    **The Work For Hire Agreement Contains an Automatic Assignment**

3        The Federal Circuit has consistently affirmed that contracts using the "hereby assign" or

4  "hereby grant" language, ████████████████████, effect a present assignment of rights.

5  *See FilmTec,* 939 F.2d at 1570, 1573 ("agrees to grant and does ***hereby grant***" all rights in future

6  inventions constitutes present assignment) (emphasis added); *DDB Techs.*, 517 F.3d at 1287, 1290

7  ("agrees to and does ***hereby grant and assign***" constitutes present assignment) (emphasis added);

8  *Speedplay,* 21 F.3d at 1253 (present assignment with: "shall belong exclusively to [employer] and

9  [employee] ***hereby*** conveys, transfers, and assigns to [employer]. . .") (emphasis added).

10        This present assignment is effective even if the alleged inventions did not exist at the time of

11  the contract. Federal Circuit law confirms that the "hereby assign" language employed in the Work

12  for Hire Agreement creates an automatic assignment and "no further act [is] required once an invention

13  [comes] into being; the transfer of title [occurs] by operation of law." *FilmTec,* 939 F.2d at 1573. Legal

14  title to the inventions thus passes no later than the filing date of the patent application. *See Bd. of*

15  *Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 842 (Fed.

16  Cir. 2009).

17        The plain language of the Work for Hire Agreement ███████████████████

18  ████████████████████████████████████████████:



23  (Ex. 2 at WC-00023842 (highlighting added); *see also* Fact 9.)[4]

24        Although the end of the second sentence provides an ██████████████[5] ██

25  ─────────────

[4] The assignment provision is unambiguous. To the extent there are any ambiguities, however, such

26  ambiguities are construed against the drafter – AIS. *See Elson v. State Farm Fire & Casualty Co.*, 691
N.E.2d 807, 811 (Ill. App. Ct. 1998) (when a contractual provision is "subject to more than one
reasonable interpretation, it is ambiguous and must be construed against" the drafter)).

27  [5] This common-sense interpretation is supported by numerous dictionary definitions: (i) Cambridge's
primary definition ("until after"); (ii) Oxford's definition ("until (something) happens"); (iii) Merriam-

28  Webster's definition ("while awaiting"); and (iv) Dictionary.com's definition ("while awaiting;

1   ███████████████████████████████████████████, neither Dr. Marks nor Mr. Trzyna could

2   identify any such agreement. (SS, Fact 13.) Windy City has not produced ████████████

3   ████████████████ any other agreement between UtiliCorp and AIS that would alter the ████

4   ██████████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████[6]

6           **b.      Dr. Marks' Work Fell Within the Scope of the Assignment**

7           The plain language of the Work for Hire Agreement ███████████████████████████

8   ███████████████████████████████████████████████████████████████████████ to

9   UtiliCorp. (Ex. 2 at WC-00023842; *see also* SS, Fact 9.) Dr. Marks's testimony on this issue could

10  not be clearer:

11      • ████████████████████████████████████████████████
        █████████████████████████████ (Ex. 1, Marks Tr. at 197:19-22.)

12      (emphasis added.)

13      • ████████████████████████████████████████████████████████████
        █████████████████████████████████████████ (Ex. 1,

14      Marks. Tr. at 145:14-19.) (emphasis added.)

15  (*See also id.* at 198:9-12; 200:19-21; 364:15-19 (redirect); 364:25-365:5 (redirect); SS, Facts 5, 10.)

16  Time and again, Dr. Marks affirmed that he ████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████████nt. (SS,

18  Fact 10.)

19          In fact, UtiliCorp, believing that it owned all of the intellectual property work in the materials

20  delivered by AIS, filed for trademarks on "PQ Chat" and "Power Quality Chat." (SS, Fact 12.)

21          Based on the language of the Work for Hire Agreement, the parties' behavior, Dr. Marks'

22  testimony, and disclosures in the asserted patents themselves, there is no genuine dispute of fact that

23  any inventions developed through Dr. Marks' work on the UtiliCorp chat system (and claimed in the

24  ─────────────────────────────────────────────────────────────────────────

25  until"). See Cambridge Dictionary (https://dictionary.cambridge.org/us/dictionary/english/pending);
    Oxford    Dictionary    (https://en.oxforddictionaries.com/definition/pending);    Merriam-Webster

26  Dictionary    (https://www.merriam-webster.com/dictionary/pending);    and    Dictionary.com
    (https://www.dictionary.com/browse/pending).

27  [6] The ████████████████████████ means that the acts of assignment
    were *completed* the moment the Agreement became operative and "no further act would be

28  required. . .the transfer of title would occur by operation of law." *FilmTec*, 939 F.2d at 1572-73. Any
    subsequent termination of the contract would have no impact on the already-operative assignment.

'491 Patent Family) fall squarely within the scope of the Work for Hire Agreement.

### 3. Windy City Never Owned the Asserted Patents and Thus Lacks Standing

Windy City's purported chain of title runs through AIS and Mr. Trzyna, Windy City's principal and the prosecuting attorney for the entire 22-year history of the patents. (Ex. 12, Assignment History.) But because AIS had assigned all of its rights to the alleged inventions to UtiliCorp, Mr. Trzyna never obtained any interest in the '491 Patent Family – a fact he was aware of by no later than ███████. (SS, Fact 15; *see also* Ex. 3, Trzyna Tr. at 192:16-193:3.). Despite this, Mr. Trzyna arranged for AIS to execute an assignment agreement purportedly transferring title of the '491 Patent Family to him ██████████████. (*See* Ex. 3, Trzyna Tr. at 46:25-47:5; 52:14-53:20.) But AIS had nothing to convey:



Due to the assignment from AIS to UtiliCorp, AIS had "nothing remaining to assign" to Mr. Trzyna or anyone else. *Bd. of Trustees of the Leland Stanford Junior Univ.*, 583 F.3d at 842 (quoting *FilmTec*, 939 F.3d at 1572). Windy City therefore does not own the patent-in-suit, and as such, the Court should dismiss this action for lack of subject matter jurisdiction.

Windy City's arguments to the contrary do not change this conclusion. Windy City's primary argument that Dr. Marks's work somehow falls outside the scope of the Work for Hire Agreement contradicts Dr. Marks's testimony and the record evidence. (*See* Section III.C.2.b., *supra*; *see also* SS, Fact 10) Windy City's back-up argument that UtiliCorp never intended to acquire rights in the '245 patent likewise contradicts the record, including the plain language of the Work for Hire Agreement, as well as UtiliCorp's efforts before the PTO to secure intellectual property rights for the "Power Quality" chat system Dr. Marks developed on their behalf. (SS, Fact 12.) In sum, Windy City never acquired rights in the '245 patent and thus lacks standing to sue Facebook for infringement in this

1   Court. Dismissal is appropriate.

2   **IV.    THE '245 PATENT IS INVALID PURSUANT TO 35 U.S.C. § 101**

3       **A.    The '245 Patent**

4       The '245 patent is titled "Real Time Communications System" and relates generally to a

5   communications system which sends messages including multimedia over the Internet. Claim 19 is

6   the sole remaining asserted independent claim. (SS, Fact 18.) Stripped of excess verbiage, claim 19 is

7   directed to a communications system in which (1) a first computer sends a message containing a

8   reference to pre-stored multimedia data; (2) a second computer receives the message and determines

9   whether or not the second computer can display the multimedia data; (3) if the second computer can

10  display the data, doing so; or (4) if the second computer cannot display the data, obtaining an agent to

11  do so. (*See* SS, Fact 19.)[7]

12      **B.    The '245 Patent Claims an Abstract Idea Implemented on Generic Components**

13      "The Supreme Court, setting up a two-stage framework, has held that a claim falls outside

14  § 101 where (1) it is 'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon,

15  or abstract idea, and (2), if so, the particular elements of the claim, considered both individually and

16  'as an ordered combination, do not add enough to transform the nature of the claim into a patent-

17  eligible application.'" *Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1350, 1353 (Fed. Cir. 2016)

18  (quoting *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 134 S. Ct. 2347, 2355 (2014)). Both stages of the

19  *Alice* framework confirm that the '245 patent is invalid under § 101.

20          **1.    *Alice* Stage 1: The Asserted Claims are Directed to an Abstract Idea**

21      At the first stage, "[c]ourts deem claims directed to 'analyzing information by steps people go

22  through in their minds, or by mathematical algorithms, without more, as essentially mental processes

23  within the abstract-idea category." *SuperCell Oy v. Gree, Inc.*, No. 17-cv-05556-YGR, 2018 WL

24  1609584, at *5 (N.D. Cal. Apr. 3, 2018) (quoting *Elec. Power*, 830 F.3d at 1354). The mere use of

25  "existing computers as tools in aid of processes focused on 'abstract ideas'" does not save a claim

26  under § 101. *Elec. Power*, 830 F.3d at 1353 (citing *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327,

---

27  [7] The dependent claims add nothing of substance and merely identify that the communication is
    produced "on demand" (claim 22) or define what type of pre-stored data is included in the
28  communication (claims 23-25). (SS, Facts 20-23.)

1335-36 (Fed. Cir. 2016).

The asserted claims of the '245 patent, though verbose, describe nothing more than sending a message, analyzing the message for display and finding a way to display the message – a concept that courts consistently hold abstract. *See Cellspin Soft, Inc. v. Fitbit, Inc.*, 316 F.Supp.3d 1138, 1150 (N.D. Cal. 2018) ("the asserted claims are directed to an abstract idea, namely a method of acquiring, transferring, and publishing data and multimedia content on one or more websites."); *Elec. Power*, 830 F.3d at 1354 ("[M]erely presenting the results of abstract processes of collecting and analyzing information, without more . . . is abstract as an ancillary part of such collection and analysis."); *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) (claim "directed to . . . collecting, displaying, and manipulating data" deemed abstract); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337-41 (Fed. Cir. 2017) (claims directed to a method of transmitting audio or video data over a network were abstract).

The abstract nature of the '245 patent is further confirmed by the ready analogy to a first person sending a VHS video tape to a second person, perhaps through the mail. The second person, after receiving the tape, determines whether she can play it. If the second person has a VHS video tape player, the tape is played. But if she only has a DVD player, or some other player type (*e.g.* BetaMax), she obtains a VHS player capable of playing the tape. Claim 19 of the '245 patent is little more than a recitation of this real-world example applied within a computer environment. Such "'generalized steps to be performed on a computer using conventional computer activity' are abstract." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1338).

The patent specification acknowledges that then-existing "[c]hat room communications can be mere text. . .or can involve graphics and certain multimedia capability, as exemplified by such Internet service providers as America On Line" and that "the World Wide Web. . .does have certain graphical multimedia capability." (Ex. 4, '245 patent at 1:40-44; 1:57-60; *see also* SS, Fact 24.) Indeed, the examples contained in the specification involved the use of the well-known commercially available Netscape Navigator browser, which was "a program for displaying graphical multimedia documents specified by a URL." ('245 patent at 10:45-11:3; *see also id.* at FIG 26.) Dr. Marks acknowledged during his deposition that he ███████████████████████████████ (SS, Fact 25); that he

1   ██████████████████████████ (SS, Fact 26); that his system was ████████████████

2   ████████ (SS, Fact 27); and that ████████████████████████████████████████

3   ████████████ (SS, Fact 28). In short, the asserted claims of '245 patent use "existing computers as

4   tools in aid of processes focused on" the abstract idea of obtaining an ability to display information

5   received in a message that could not previously be displayed, which is "not sufficient to remove [them]

6   from the abstract-idea category." *Supercell*, 2018 WL 1609584, at *5 (citing *Enfish*, 822 F.3d at 1335-

7   36; *Alice*, 134 S.Ct. at 2358-59).

8   As this Court recognized in *Supercell*, "[u]ltimately, to be patentable, claims must 'sufficiently

9   describe how to achieve [an improvement in computer technology] in a non-abstract way.'" 2018 WL

10  1609584, at *6 (alteration in original) (quoting *Two-Way Media*, 874 F.3d at 1337). Here, the asserted

11  claims are "simply directed to [the] abstract end-result" of obtaining the ability to display information

12  received in a message that could not previously be displayed, and not to a "specific means or method

13  for improving technology." *RecogniCorp*, 855 F.3d at 1326 (internal quotations omitted). The claims

14  of the '245 patent do not recite *how* the second participator computer performs the function of

15  determining whether or not it can present the pre-stored data, *how* the second participator computer

16  obtains an agent with an ability to present the pre-stored data, *what* the agent is, or *how* it functions.

17  *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240-41 (Fed. Cir. 2016) (patents directed to an

18  abstract idea because they "do not claim a particular way of programming or designing the

19  software. . .but instead merely claim the resulting systems."); *Two-Way Media*, 874 F.3d at 1337

20  (finding limitations requiring "sending" and "directing" of information "d[id] not sufficiently describe

21  how to achieve these results in a non-abstract way"); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*,

22  838 F.3d 1253, 1258-59 (Fed. Cir. 2016) (holding that claims were directed to an abstract idea where

23  they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region

24  recipient, not a particular way of performing that function"); *see also Interval Licensing LLC v. AOL,*

25  *Inc.* , 896 F.3d 1335, 1338, 1340-47 (Fed. Cir. 2018) ("[T]he claims do not recite *how* the attention

26  manager performs the function of determining where to display images in the 'windowed'

27  environment so that they do not interfere with a user's primary activity.") (emphasis in original).

28  Because the asserted claims fail to describe a specific "means or method for improving

technology," they are directed to the generic computer implementation of an abstract idea and satisfy stage one of the *Alice* inquiry. *See RecogniCorp*, 855 F.3d at 1326; *see also SuperCell*, 2018 WL 1609584, at *6-7; *CellSpin*, 316 F. Supp. 3d 1150-52.

## 2. *Alice* Stage 2: The Asserted Claims Do Not Add Patentable Weight

The second stage of *Alice* asks the Court "to determine whether the claims do significantly more than simply describe [the] abstract method." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). At this stage, the Court determines whether the claims "contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice,* 134 S. Ct. at 2357 (internal quotations and citation omitted). "To save a patent at step two, an inventive concept must be evident in the **claims**." *RecogniCorp*, 855 F.3d at 1326-27 (emphasis added); *Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (patent-ineligibility focuses on the scope of the claims, not the length of the specification); *Two-Way Media*, 874 F.3d at 1337-41 (same).

The asserted claims here "merely provide a generic environment in which to carry out" the abstract idea of obtaining the ability to display information received in a message that could not previously be displayed. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016). Nothing in the claims "purport[s] to improve the functioning of the computer itself" or to "effect an improvement in any other technology or technical field." Alice, 134 S. Ct. at 2359. Nor are the claims "necessarily rooted in computer technology" to "overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Rather, asserted claim 19 merely "follows a conventional order of how data is usually analyzed: data is first *received*, then *processed*, and then signals are *outputted* as a result." *Immersion Corp. v. Fitbit, Inc.*, 313 F. Supp. 3d. 1005, 1030 (N.D. Cal. 2018) (emphasis added). Describing the operation of data analysis within a conventional communications system is insufficient to confer patent eligibility on Windy City's claims. *See Elec. Power*, 830 F.3d at 1355 ("[M]erely selecting information, by content or source, for collection, analysis, and display" does not provide an inventive concept.).

The non-specific description of the claimed hardware components combined with the generic

language of the claims further underscores that the '245 claims do not contain an inventive concept. (*See* SS, Facts 29, 30.) According to the specification, the "computer system" includes a digital Controller Computer **3**, such as an Internet service provider-type computer" and the "participator computers" are generic "IBM-compatible person computer[s] with a processor and a DOS operating system." (Ex. 4, '245 patent at 5:1-4.) The specification describes the claimed "agent" in purely functional terms (*id.* at 7:34-43), even when it identifies the commercially available Netscape Navigator as "a program for displaying graphical multimedia documents specified by a URL" (*id.* at 10:67-11:1). In short, the "recited physical components . . . behave exactly as expected according to their ordinary use" and thus cannot provide any inventive concept. *TLI*, 823 F.3d at 615. According to the claims, these generic components are programmed to perform generic steps common to communications systems, namely "communicat[ing]" a message, "receiv[ing]" the message, "determin[ing]" if the message can be presented, "obtaining" an ability to present information contained in the message, and "presenting" information contained in the message. This generic recitation fails to articulate any specific means or method and instead is directed to a "general concept . . . without offering any technological means of effecting that concept." *DIRECTV*, 838 F.3d at 1262 (internal citation omitted).

Moreover, the claims do not "solve a problem unique to the Internet." *Morg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016). Rather, the concepts addressed in the asserted claims existed long before the Internet. Utilizing pointers to point to information stored in a different location has been around at least since Melvil Dewey first published his Decimal System in 1876. Similarly, the concepts of passwords and tokens to aid in authentication are the hallmark of any good secret society. And finally, decades before Dr. Marks's alleged invention, people were obtaining audiocassette players to replace their old eight-track players (which replaced their record players) to ensure that they could listen to the latest music on the latest medium.

Facebook does not believe that resolution of the "inventive concept" prong requires expert testimony, as the underlying facts are undisputed and the lack of an inventive concept can be shown entirely by reference to the claims and the patent specification. Nevertheless, Dr. Storer, Facebook's invalidity expert, provided a detailed analysis of the asserted claims and established that, consistent

with the specification, everything recited in the claims was routine, conventional, and well-understood. (SS, Fact 30.) Dr. Storer's testimony **stands unrebutted** because Windy City's rebuttal invalidity expert, Dr. Mark Jones, chose not to provide any opinions on subject matter eligibility under § 101. (SS, Fact 31.) Windy City's arguments that Dr. Jones' report addressed eligibility because it discussed prior art in general (Ex. 9, Hr'g Tr. at 29:13-30:9, Jan. 28, 2019) changes nothing, because "[e]ligibility and novelty are separate inquiries." *See Two-Way Media*, 874 F.3d at 1339-40 (affirming district court's rejection of materials related to novelty or non-obviousness as part of § 101 eligibility analysis.) Dr. Jones did not offer any opinion regarding eligibility, as confirmed by Windy City during the pre-filing conference. (Ex. 9, Hr'g Tr. at 29:13-30:9).

Simply put, a "patent 'does not become nonabstract' merely because [it is] set in a 'technological environment' consisting of conventional components and utilizing standard technology." *Cellspin*, 316 F. Supp. at 1152 (citing *Symantec Corp.*, 838 F.3d at 1319; *Alice*, 134 S. Ct. at 2358). The '245 patent recites generic computer components as tools in furtherance of an abstract idea. The Federal Circuit has "repeatedly held that such invocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept." *Electric Power*, 830 F.3d at 1355-56.

## V.   FACEBOOK DOES NOT INFRINGE THE '245 PATENT

### A.   Facebook Messenger Does Not Literally Infringe Any Claim

"Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, i.e., when 'the properly construed claim reads on the accused device exactly.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1358 (Fed. Cir. 2000) (citation omitted). In this case, literal infringement is the only avenue available to Windy City, as it has offered no theory of infringement under the doctrine of equivalents. (Ex. 8, Jones Tr. 15:21-16:5, Jan. 11, 2019.)

#### 1.   Facebook Messenger Does Not Meet the "Real Time" Limitation

Claim 19 recites a requirement of the communication, which includes the pre-stored data, "being sent in <u>real time</u> and via the Internet network." (SS, Fact 19.) The term "real time" should be construed as "immediately, without being stored on a server" based on the specification and statements made by Windy City during prosecution to distinguish prior art. (D.I. 108 at 6-11; SS, Fact 32.)

1   More specifically, as explained in the parties' claim construction briefing, Windy City told the

2   PTO that messages "stored on a server . . . are **therefore fundamentally different** from

3   communications being sent and received **in the claimed real-time**," in order to distinguish the prior

4   art. (SS, Fact 32; *see also* D.I. 108-7 at 4-5.) As such, "real time" should be construed in view of

5   Windy City's disclaimer as "immediately, without being stored on a server." *See, e.g., Omega Eng'g,*

6   *Inc. v. Raytek Corp*., 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer

7   is well established in Supreme Court precedent, precluding patentees from recapturing through claim

8   interpretation specific meanings disclaimed during prosecution."). To construe "real time" any other

9   way would allow Windy City to recapture precisely what it surrendered during prosecution.

10   If the Court adopts Facebook's construction of "real time," Windy City has zero evidence of

11   infringement. Dr. Jones, Windy City's technical expert, acknowledged that he did not conduct any

12   analysis as to whether or not Facebook infringes under Facebook's construction of "real time." (SS,

13   Fact 33.) He further admitted that this was because, "in the analysis that [he] performed with respect

14   to Facebook's alleged infringement, the communication is stored on the server." (*Id.* at 25:9-13; *see*

15   *also* SS, Facts 35-37.) Facebook therefore does precisely what Windy City called "***fundamentally***

16   ***different*** from communications being sent and received **in the claimed real-time**," *i.e.* stores the

17   communication on a server. (SS, Fact 32, 35-37.)

18   Windy City's argument that the chat transcript (Ex. 4, '245 patent at 11:63-21:17) in the

19   specification somehow proves that the preferred embodiment stores messages on a server prior to

20   delivery is misplaced. (Ex. 9, Hr'g Tr. at 32:22-33:7.) All the printed transcript shows is that the

21   *receiving* computer stores the message at some point, or is able to "print screen"; it fails to show that

22   the messages are stored at the intermediary server.

23   Because there is no dispute that Facebook Messenger stores communications on a server,

24   summary judgment is appropriate if the Court holds Windy City to its word and adopts Facebook's

25   construction. *See MyMail, Ltd. v. America Online, Inc*., 476 F.3d 1372, 1378 (Fed. Cir. 2007)

26   ("Because there is no dispute regarding the operation of the accused systems, that issue [of literal

27   infringement] reduces to a question of claim interpretation and is amenable to summary judgment.")

28   (citing *General Mills, Inc. v. Hunt-Wesson, Inc.,* 103 F.3d 978, 983 (Fed. Cir. 1997) ("Where the

1   parties do not dispute any relevant facts regarding an accused product . . . but disagree over possible

2   claim interpretations, the question of literal infringement collapses into claim construction and is

3   amenable to summary judgment.")).

### 2.   Facebook Messenger Does Not Meet "The Private Message" Limitation

5   Claim 19 of the '245 patent recites "a first of the plurality of participator computers being

6   programmed to communicate such that **a private message** is sent to the computer system." (Ex. 4,

7   '245 patent, claim 19 [d] (emphasis added).) Claim 19 later references this "private message" as

8   follows: "the second participator computer is programmed to receive the communication provided

9   within **the private message, which originates from the first participator computer**." (*Id.*, claim

10   19[h] (emphasis added.)) Based on both the plain reading of the claim language and the inventors'

11   decision to employ the anaphoric phrase "the," claim 19 of the '245 patent contemplates a single

12   private message that originates from the first participator computer, is sent through the computer

13   system, and that same "private message" is received by the second participator computer. *See Baldwin

14   Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (noting that claim terms

15   reciting "the" or "said" are "anaphoric phrases, referring to the initial antecedent phrase."). This was

16   consistent with the interpretation adopted by Windy City's technical expert, who understood the

17   reference to "the private message" to refer back to the same private message originating from the first

18   participator computer. (*See, e.g.*, Ex., 8, Jones Tr. 69:19-70:9)

19   But Facebook Messenger does not have a single private message that meets the limitations of

20   the asserted claims. The message that a user sends to Facebook's servers is different – in content and

21   in format – from the message that Facebook's servers send to the recipient. (SS, Facts 38, 39.)

22   According to Dr. Jones, the private message that is sent from the first participator computer to

23   Facebook's servers is an HTTP message (in web Messenger) or a chat message with topic "t_sm" (in

24   mobile messenger). (SS, Facts 41, 42.) The private message that is sent from Facebook's servers to

25   the recipient's participator computer, however, is a "delta message" – a message containing

26   differences between the user's local mailbox and the mailbox stored on Facebook's servers. (SS, Facts

27   43-45.) Delta messages are formatted using JSON (in web messenger) or Thrift (in mobile messenger).

28   (*Id.*) A delta message is not the same as the message that is originally received by Facebook's servers

in either content or format–a fact Dr. Jones admitted during his deposition. (SS, Fact 39; *see also* SS, Fact 40.) Moreover, all of the examples from Dr. Jones's report confirm the same to be true. (*See* SS, Fact 45 (citing Ex. 10, Jones Infr. Rpt. ¶¶ 182, 183, 266, 293 (Fiddler captures showing different message content for same send/receive operation)); *see also* Fact 40.) Critically, these differences are more than mere formatting changes, as Windy City argues. (Ex. 9, Hr'g Tr. at 38:19-22.) As shown in Dr. Jones's own report, the requests and responses contain substantially different message content and are even identified by Dr. Jones as different "message request" numbers. (SS, Fact 45.) Dr. Jones admitted that, in the course of his investigation of Facebook Messenger, he could not identify any instance in which the alleged "private message" from the sender was the same as the "private message" transmitted to the recipient. (SS, Fact 40.)

Because Facebook's servers process and alter the <u>content and format</u> of all messages, the "private message" the first participator computer sends to Facebook's servers is not the same "private message" that the second participator computer receives from the servers. (SS, Facts 40, 45.) Dr. Jones does not and cannot dispute that these messages are different. (*Id.*) As such, it is undisputed that Facebook Messenger does not send "the private message" originating from a first participator computer through the computer system to be received by a second participator computer. Summary judgment of no infringement is thus appropriate.

## B. Facebook Does Not Directly Infringe

Claim 19 recites a "plurality of participator computers," which Windy City has mapped to the user's computing devices running Facebook Messenger. (SS, Facts 46, 47 (Dr. Jones defining participator computer as "a computer or mobile device running Messenger client software").) There is no dispute that Facebook does not provide computers or mobile devices to its end users. (SS, Fact 48.)[8] Because Facebook does not provide each element of the apparatus recited in claim 19, it cannot be liable for direct infringement as a matter of law. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215

---

[8] At the pre-filing conference, Windy City's attorney argued that Facebook infringes when it "puts on the programming that meets the step of the claims" and Facebook doesn't "have to actually manufacture the hardware" to infringe the asserted claims. (Ex. 9, Hr'g Tr. at 50:5-12.) Windy City's counsel is incorrect as a matter of law. The asserted claims are not method claims, but are apparatus claims which require "a plurality of participatory computers" as one of the limitations. (SS, Facts 19, 45.) As such, *Centillion* is directly on point and dispositive of Windy City's direct infringement allegations.

F.3d 1246, 1252, n.2 (Fed. Cir. 2000) ("[O]ne may not be held liable under § 271(a) for 'making' or 'selling' less than a complete invention."); *Centillion Data Sys., L.L.C. v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("Supplying the software for the customer to use is not the same as using the system."); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 479-82 (D. Del. 2018) (granting summary judgment because sale of software discs did not make, use, or sell the claimed invention, which required a specific computer network).

In fact, this case is indistinguishable from *Centillion Data Systems*, *supra*, which involved an asserted patent whose claims included both a "back-end" system maintained by a service provider, and a "front-end" system maintained by the end user such as a personal computer. 631 F.3d at 1281. The Federal Circuit held that the defendant (Qwest) could not, as a matter of law, be liable for direct infringement under § 271(a) because it only provided software for the personal computers – and did not provide the personal computers themselves. *Id.* at 1286 ("While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system."); *id.*, at 1288 ("In order to 'make' the system under § 271(a), Qwest would need to combine all of the claim elements – this it does not do. The customer, not Qwest, completes the system by providing the 'personal computer data processing means' and installing the client software."). Here, Facebook does not provide the first or second "participator computers" because it does not provide the computing devices end users utilize to access Facebook Messenger. (SS, Facts 48, 49.) That Facebook provides the Messenger software is irrelevant because, as noted, "[s]upplying the software for the customer to use is not the same as using the system." *Id.* at 1286.

Accordingly, the only theory available to Windy City is to show that Facebook is vicariously liable for the actions of its users. *Id.* at 1286 ("The only way that Centillion can establish 'use' by Qwest is if Qwest is vicariously liable for the actions of its customers such that "use" by the customers may be attributed to Qwest."). But Windy City has no evidence whatsoever of vicarious liability. As was the case in both *Centillion* and *Acceleration Bay*, Facebook's customers do not act as its agents as a matter of law, nor are they contractually obligated by Facebook to act. *Centillion*, 631 F.3d at 1288; *Acceleration Bay*, 324 F. Supp. 3d at 482. Dr. Jones acknowledged that it is entirely up to

Facebook users whether they choose to use Messenger, whether or not they choose to send messages, and whether or not they choose to include multimedia content with those messages. (SS, Facts 50-52.) This is consistent with the Facebook terms of service which, during the entire period of alleged infringement, made clear that Facebook does "not control or direct" user actions. (SS, Fact 52.)

Windy City also claims that direct infringement can be established by internal testing of Facebook Messenger, but provides no evidence. Federal Circuit law is clear that a general averment that an accused infringer tested products in an infringing manner is insufficient; specific evidence of actually infringing testing is required. *See Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1335-36 (Fed. Cir. 2008) (affirming summary judgment based on a lack of "specific evidence that [Defendant] tested [the accused products] in a way that would constitute infringement"); *see also Acceleration Bay*, 324 F. Supp. 3d at 483-84 (granting summary judgment based on lack of specific testing evidence); *Centrak, Inc. v. Sonitor Techs., Inc.*, No. 14-183-RGA, 2017 WL 3730617 at *7 (D. Del. Aug. 30, 2017) (granting summary judgment where patentee alleged generally that "if the system was sold, Defendant must necessarily have tested it."). To support his testing allegations, Dr. Jones cites to three documents and testimony from the depositions of two Facebook engineers. (Ex. 10, Jones Infr. Rpt. ¶ 360, n.219.) None of this evidence is in any way specific to Windy City's allegations of infringement. At best, the documents and deposition testimony cited reference some generalized testing of attachment functionality within Messenger, but contain no specifics of how the testing occurs, what functionality was tested, what the results were, and how the testing might relate to the specific functionality claimed in the '245 patent. In short, Windy City has failed to present *any* evidence that Facebook ever tested its products in a manner that infringes the full scope of the asserted claims and thus are insufficient to survive summary judgment. *Ricoh*, 550 F.3d at 1335-36.

Moreover, Windy City's damages expert does not account for any harm associated with Facebook's alleged internal testing. Indeed, as explained in the currently-pending *Daubert* motion against Windy City's damages expert, the entire damages model in this case is based on a "per user" royalty calculated based on the number of Facebook users who allegedly use Facebook Messenger – not based on the purported value of internal testing. (*See* D.I. 155 at 5-9.) As counsel for Windy City conceded during the pre-filing hearing, Windy City's damages model "is more premised on the larger

1  case, which, of course, is what drives value, when the users. . .use the system," *i.e.*, indirect

2  infringement. (Ex. 9, Hr'g Tr. at 47:12-16.)

3  ### C.   Facebook Does Not Indirectly Infringe the '245 Patent

4  #### 1.   Facebook Is Not Liable for Indirect Infringement

5  It is well-established that to indirectly infringe a patent, an accused infringer must have

6  knowledge of the patent and knowledge of the alleged infringement. *Commil USA, LLC v. Cisco Sys.,*

7  *Inc.*, 135 S.Ct. 1920, 1926 (2015). "In contrast to direct infringement, liability for inducing

8  infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute

9  patent infringement.'" *Id.* (citing *Global-Tech Appliances, Inc. v. SEB S.A*, 131 S.Ct. 2060, 2068

10 (2011)). "Like induced infringement, contributory infringement requires knowledge of the patent in

11 suit and knowledge of patent infringement." *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement*

12 *Co.*, 377 U. S. 476, 488 (1964)).

13 Windy City has no evidence that Facebook had knowledge of the '245 patent prior to Windy

14 City filing this lawsuit on June 2, 2015. (SS, Fact 54.) Windy City did not attempt to notify Facebook

15 of any alleged infringement prior to filing suit. (SS, Fact 53.) Because it is undisputed that Facebook

16 did not have notice of the '245 patent or of Windy City's allegations of infringement prior to June 2,

17 2015, Facebook could not have induced or contributed to infringement prior to that date and summary

18 judgment of no pre-suit indirect infringement is appropriate. *See, e.g., DSU Med. Corp. v. JMS Co.,*

19 *Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006); *Alarm.com, Inc. v. SecureNet Techs. LLC*, 345 F. Supp.

20 3d 544, 553-54 (D. Del. 2018) (granting summary judgment of no pre-suit indirect infringement even

21 where defendant may have had pre-suit knowledge of asserted patent).

22 With respect to post-filing indirect infringement, Dr. Jones's conclusory allegation that

23 Facebook "had notice of. . .Windy City's allegations of Facebook's infringement" as of the filing of

24 the lawsuit on June 2, 2015 ignores the record. (Ex. 10, Jones Infr. Rpt., ¶ 362.) Windy City's

25 Complaint in this action asserted four patents, which had 830 total claims between them. (SS, Fact

26 54.) The entire Complaint was ten pages long and contained a single count, alleging direct

27 infringement, active inducement, and contributory infringement of all four patents, without identifying

28 any specific claim. (SS, Facts 55, 56; *see also* Ex. 9, Hr'g Tr. at 56:22-25.) Windy City failed to

1    identify any specific Facebook product, instead relying on inscrutable definitions for "Facebook.com"

2    and "Facebook apps" instead of identifying the specifically accused Facebook Messenger product

3    (D.I. 1 at 4-6.) In short, Windy City's Complaint did not identify the now-asserted claims, did not

4    identify the now-accused products, and did not provide any insight whatsoever into Windy City's now-

5    asserted infringement allegations. (SS, Facts 56-61.)

6            Critically, the patent, by Windy City's own admission, expired in April 2016, less than a year

7    after the Complaint was filed. (SS, Fact 62.) It is undisputed that this entire litigation was effectively

8    stayed at that time. In July 2015, Facebook moved to dismiss Windy City's threadbare allegations of

9    indirect infringement and asked for an identification of the accused products, the asserted claims, and

10   Windy City's infringement allegations. (*See* D.I. 20.) Windy City opposed and refused to provide any

11   additional information and argued it would only provide its infringement allegations after a scheduling

12   order was in place, in accordance with the Western District of North Carolina's local rules. (*See* D.I.

13   21 at 17-19.) The Western District Court never ruled on Facebook's motion to dismiss, and this case

14   was transferred to this Court in March 2016. (D.I. 31.) Following transfer, Facebook again sought

15   more information from Windy City about the asserted claims and its actual infringement allegations

16   (D.I. 46) and Windy City again opposed Facebook's efforts and again sought to delay even the

17   identification of asserted claims (D.I. 49). Windy City did not provide Facebook with any specific

18   infringement allegations or asserted claims until October 2016, six months *after* expiration of the '245

19   patent. (SS, Facts 56-61.) It is not credible to argue that Facebook had actual knowledge of or was

20   willfully blind to Windy City's specific infringement allegations – allegations which have changed

21   over the last three-and-a-half years – during the short window of ten months between the filing of the

22   Complaint and the expiration of the '245 patent when there were no infringement contentions and only

23   a threadbare Complaint with no claims listed.

24           After submitting that barebones Complaint potentially asserting over 800 claims devoid of

25   meaningful infringement analysis, and after fighting Facebook's efforts to obtain even an

26   identification of asserted claims until six months after the patents expired, Windy City cannot now be

27   heard to claim that Facebook knew its users allegedly infringed or that components of its unidentified

28   products were especially made for infringing the remaining five asserted claims of the '245 patent.

Windy City made the deliberate choice to obfuscate its allegations and wait until after its patent had expired to provide any meaningful disclosures. It must now live with the consequences of those actions. Because Facebook did not have knowledge of the alleged infringement until after expiration of the '245 patent, it cannot be liable for indirect infringement and summary judgment is appropriate. *See Allvoice Dev. U.S., LLC v. Microsoft Corp.*, 988 F. Supp. 2d 1248, 1262-63 (W.D. Wash. 2013) (granting summary judgment of no induced infringement where evidence was sufficient to show knowledge of the patent but did not create genuine issue as to knowledge of infringement).

### 2.      Facebook Is Not Liable for Contributory Infringement

Windy City must show the following elements to carry its burden of proving contributory infringement: (1) that there is direct infringement, (2) that the accused infringer had knowledge of the patent and knowledge of the infringement, (3) that the component has no substantial noninfringing uses, and (4) that the component is a material part of the invention. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326, 1330 (Fed. Cir. 2010) (citing 35 U.S.C. § 271(c)); *see also Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009) ("Contributory infringement imposes liability on one who embodies in a non-staple device the heart of a patented process and supplies the device to others to complete the process and appropriate the benefit of the patented invention.").

Facebook cannot be a contributory infringer because Windy City has failed to establish the first two elements. (*See* Sections V.A, V.C.1, *supra*.) Facebook also cannot be a contributory infringer because the record establishes that the accused Messenger product has numerous substantial non-infringing uses. Dr. Jones only posits conclusory opinions regarding substantial non-infringing uses

> Facebook sells and offers for sale (and has sold and has offered for sale) a component – the code that infringes Windy City's apparatus claims that allow a user to engage in real time multimedia communications, as described in my infringement [sic] of this report. This component is not a staple article of commerce suitable for substantial non-infringing use with respect to these claims. This component's intended purpose is to be used by Facebook's end-user customers so that they can use devices as claimed in Windy City's patents, and there is no noninfringing use of this component.

(Ex. 10, Jones Infr. Rpt., ¶ 365.) The remainder of Dr. Jones's infringement report is bereft of any analysis of (i) whether Facebook Messenger constitutes a material part of the invention or (ii) whether Facebook Messenger has any non-infringing uses. This conclusory analysis is insufficient to survive

1   summary judgment. *See Parallel Networks Licensing, LLC v. Int'l Bus. Mach. Corp.*, No. 13-2072
2   (KAJ), 2017 WL 1045912, *8 (D. Del. Feb. 22, 2017) (Jordon, J. by designation) (granting summary
3   judgment because the "only evidence [patentee] offers on this issue is a conclusory statement by Dr.
4   [Mark] Jones that 'there is no substantial, non-infringing use of the accused components.'").

5         As a preliminary matter, contributory infringement liability can only attach to one who "**offers**
6   **to sell** or **sells** within the United States or imports into the United States a component…" 35 U.S.C. §
7   271(c) (emphasis added). There is no evidence supporting Dr. Jones's assertion that Facebook "sells
8   and offers for sale" "the code that infringes Windy City's apparatus claims that allow a user to engage
9   in real time multimedia communications." (Ex. 10, Jones Infr. Rpt., ¶ 365.) The Facebook Messenger
10  product, which executes that supposed code, is given away free of charge to users. (SS, Fact 63.)

11        Dr. Jones's focus on the allegedly infringing code misses the mark. "To determine whether a
12  product is a staple of commerce, a court must look at the entire device and not just the part capable of
13  practicing the claims of the patent at issue." *TV Interactive Data Corp. v. Microsoft Corp.*, No. C 02
14  02385 JSW, 2005 WL 1910929, *4 (N.D. Cal. Aug. 10, 2005) (citing *Hodosh v. Block Drug Co.,* 833
15  F.2d 1575, 1578 (Fed.Cir.1987)); *see also AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374,
16  1380 (Fed. Cir. 2005) (proper inquiry is whether multi-layered product identified as "apparatus for use
17  in practicing," not just accused component, had no noninfringing uses). Here, the overall Facebook
18  Messenger service is the entire device. (Ex. 10, Jones Infr. Rpt., ¶ 360.) And Dr. Jones concedes that
19  Facebook Messenger has many non-infringing use cases, including group multimedia messages, group
20  text messages, one-on-one text messages, video calls, voice calls, stickers. (SS, Facts 64-69.) The
21  evidence of record shows that these non-infringing uses constitute the overwhelming majority of
22  Facebook Messenger use. (SS, Fact 70; *see also* SS, Facts 64-69.) As such, there is no material dispute
23  between the parties that the apparatus accused of infringement, *i.e.* Facebook Messenger, is a staple
24  article of commerce suitable for many substantial non-infringing uses and summary judgment is
25  appropriate. *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362-63 (Fed. Cir. 2012) (affirming
26  summary judgment of no contributory infringement); *Vita-Mix*, 581 F.3d at 1327-28 (same).

27        Even assuming that Dr. Jones's focus on the specific accused code that "allow[s] a user to
28  engage in real time multimedia communications" is correct – which it is not – the asserted claims of

the '245 patent cover ***only*** private messages (*i.e.*, messages with only one intended recipient). As such – as Dr. Jones concedes – an identical group message (*e.g.*, a message with more than one intended recipient) does not infringe the '245 patent. (SS, Fact 66.) Group multimedia communications represent a substantial non-infringing use of "allow[ing] a user to engage in real time multimedia communications." (*See Vita-Mix*, 581 F.3d at 1327 ("[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.").)

Windy City failed to put forth any evidence or analysis required for liability under 35 U.S.C. § 271(c) – whether or not Facebook Messenger lacks any substantial non-infringing uses. Dr. Jones's perfunctory recitation of the legal standard is insufficient and contradicts the record evidence (*see* SS, Fact 70). Summary judgment of no contributory infringement is warranted.

## VI.   CONCLUSION

Windy City never obtained any rights in the '245 patent, as the rights it sought to obtain had already been assigned to a third party. Thus, Windy City does not have standing to sue and this Court lacks subject matter jurisdiction. Windy City's '245 patent claims an abstract idea implemented on generic computer components and is devoid of any inventive concept. Thus, the '245 patent fails to claim eligible subject matter and is invalid under 35 U.S.C. § 101. With respect to non-infringement, when properly construed, the asserted claims of the '245 patent do not read on multiple aspects of Facebook Messenger. Facebook also does not directly infringe because it does not provide the "participator computers" required by the asserted claims. Facebook also does not indirectly infringement because it had no knowledge of alleged infringement and Facebook Messenger has numerous substantial non-infringing uses. For all the foregoing reasons, Facebook respectfully requests the Court grant summary judgment of lack of standing, invalidity, and non-infringement.

February 11, 2019                COOLEY LLP,

                                 */s/ Heidi L. Keefe*
                                 Heidi L. Keefe

                                 Attorney for Defendant
                                 Facebook, Inc.